[No. E006333. Fourth Dist., Div. Two. Nov. 30, 1989.]

CHARLES C. TWAITE, Plaintiff and Appellant, v.
ALLSTATE INSURANCE COMPANY et al., Defendants and
Respondents.

COUNSEL

John A. Sandquist for Plaintiff and Appellant.

Parkinson, Wolf & Leo, Dawn Cushman and R. Lynn Schwartz for Defendants and Respondents.

OPINION

McDANIEL, Acting P. J.—The appeal here is from a summary judgment, entered in favor of Allstate Insurance Company (Allstate) and its claim adjuster Susan Rossel (Rossel) in a first party action brought by Allstate's insured Charles C. Twaite (plaintiff). Plaintiff's complaint charged Allstate with common law, bad faith breach of contract, with breach of duties arising under section 790 et seq. of the Insurance Code (Unfair Practices Act) and both Allstate and Rossel with negligent and intentional infliction of emotional distress, giving rise to general as well as exemplary damages. With reference to the proceedings here under review, the filings in support of the motion for summary judgment amply demonstrated a prima facie entitlement to the legal relief sought, and the filings in opposition failed to raise a triable issue of material fact. Accordingly, the motion was properly granted, and we shall affirm the judgment entered thereon.

### EVENTS LEADING TO THE LITIGATION

In November of 1984, plaintiff bought a used Mustang automobile from Rufus Hook. As appears from a copy of the contract of sale included in the record, the cash price for the vehicle was $8,295. To this amount was added a "document preparation charge" of $20, sales tax of $498.90 and a service contract charge of $495, yielding a total of $9,308.90.[1] Otherwise, plaintiff opted to purchase, through the dealer, a credit life and disability insurance policy, the premium for which was $860.02; the license fee was $169. These six figures aggregate $10,337.92 against which plaintiff made a down payment of $1,100, leaving $9,237.92 to be financed. The finance charge for this deferred balance, over the 48 months of the contract, was $3,694.72, yielding a total obligation of $12,932.64 to be paid in monthly installments of $269.43.

Before January 23, 1985, plaintiff purchased a policy of automobile insurance written by defendant Allstate, insuring plaintiff, among other things,

---

[1] Somewhat disingenuously, it is this figure, i.e., $9,308.90, which plaintiff alleged in his complaint as the amount of "the cash price" he paid for the vehicle rather than the $8,295, representing the sticker price actually paid.

against collision loss of the Mustang. By its terms, pertinent to the loss payable portion of the policy, it provided that "Allstate may pay for the [collision] loss in money, or may repair or replace the damaged or stolen property . . ." The policy further provided, under its limits of liability, that "Allstate's limit of liability is the actual cash value of the property or damaged part of the property at the time of the loss. The actual cash value will be reduced by the deductible for each coverage shown on the declarations page. However, our liability will not exceed what it would cost to repair or replace the property or part with other of like kind and quality." The applicable deductible here was $250.

On the date noted, January 23, 1985, plaintiff was involved in a mishap on the Ortega Highway in Orange County in which the Mustang was "totalled." Within two days thereafter, Rossel undertook an investigation of the loss for the purpose of effecting an adjustment of whatever claim plaintiff might assert, arising from the Mustang collision loss.

Rossel's initial efforts on plaintiff's behalf resulted in a prompt offer to plaintiff, as permitted under the alternative terms of the policy, of a replacement vehicle which was mechanically superior to his totalled Mustang and which carried more optional equipment. Plaintiff turned it down.

Thereafter, following efforts to determine the "actual cash value" of the Mustang before it was demolished, Rossel arrived at a figure of $7,030.83 which, less the $250 deductible, yielded a figure of $6,780.83, communicated to plaintiff, who did not dispute it. Later, a draft in this amount was tendered to plaintiff. The draft was issued to Security Pacific Bank, legal owner of the vehicle, and applied to reduce plaintiff's obligation to the bank by that amount. This was *28 days* following the date of loss and 26 days after investigation of the loss had been undertaken.

About a month later, plaintiff wrote to Allstate advising that the dealer had cancelled the credit life insurance and that the refund of a portion of the original premium had been paid to the bank, further reducing plaintiff's obligation to the bank. In this letter, nothing was said by way of disputing the amount of Allstate's payment of $6,780.83, reflecting the carrier's determination of the actual cash value of the Mustang on the date of loss, less the deductible.

About six months later, counsel for plaintiff wrote to Allstate threatening to sue for bad faith because it had failed to advise plaintiff, its insured, that he had a right to an appraisal as a part of determining the actual cash value of the Mustang. Almost a year later the action underlying this appeal was filed.

## Synopsis of Trial Court Proceedings

The complaint, in five counts, charged Allstate with: (1) bad faith breach of contract; (2) breach of fiduciary duties; (3) breach of statutory (Ins. Code) duties; (4) intentional infliction of emotional distress; and (5) negligent infliction of emotional distress. Rossel was named in the latter two counts. Allstate's demurrer to the second and fourth counts was sustained without leave to amend, and it then answered the remaining counts, i.e., one, three and five, interposing seven affirmative defenses. Rossel also answered as to count five, likewise interposing seven affirmative defenses.

After the case was thus at issue, both sides pursued extensive discovery efforts. Allstate and Rossel then moved for summary judgment or in the alternative for summary adjudication of certain issues. As part of their filing, both defendants specified the following as issues without substantial controversy.

"*ISSUE NO. 1*: Allstate promptly adjusted plaintiff Twaite's claim for property damage to his vehicle.

"*ISSUE NO. 2*: Allstate treated plaintiff equitably by offering plaintiff the option of a replacement vehicle or the actual cash value.

"*ISSUE NO. 3*: On or about February 18, 1985, Allstate tendered payment to plaintiff Twaite in the amount of $6,780.83 representing the $7,030.83 actual cash value of the automobile minus a $250 deductible; such payment was reasonable as a matter of law.

"*ISSUE NO. 4*: Allstate's investigation conducted in order to ascertain the actual cash value of plaintiff's automobile was reasonable as a matter of law.

"*ISSUE NO. 5*: As a matter of law, plaintiff was not entitled to reimbursement by Allstate for the value of the maintenance contract or credit insurance.

"*ISSUE NO. 6*: At no time prior to instituting this action did plaintiff state or otherwise indicate to Susan Rossel that the amount paid by Allstate was unreasonable.

"*ISSUE NO. 7*: At all times during the handling of plaintiff's claim, Allstate and Susan Rossel acted courteously and in good faith.

"*ISSUE NO. 8*: At no time prior to accepting Allstate's payment of $6,780.83 did plaintiff request arbitration or appraisal.

"*ISSUE NO. 9*: Because Allstate and Susan Rossel treated plaintiff fairly throughout the claims handling process, as a matter of law, plaintiff's claim for negligent infliction of emotional distress must fail."

In support of their motion, Allstate and Rossel filed various exhibits, plaintiff's answers to interrogatories and excerpts of depositions of the parties and others, these in addition to the declaration of Rossel.

Summarizing the contents of both the Rossel declaration and of her deposition, supplemented by certain of the exhibits filed in support of the motion for summary judgment, the evidence shows the following.

On January 23, 1985, plaintiff was in an accident and his Mustang was totally demolished. On January 25, 1985, Susan Rossel, a staff claim representative employed by Allstate, was assigned to plaintiff's claim as the claims adjuster. Rossel first telephoned plaintiff and obtained information regarding the purchase price of the used 1983 Mustang. Thereafter, she consulted the November/December 1984 issue of the Kelley Blue Book as well as the January/February 1985 issue of the Kelley Blue Book. She also consulted the AutoTrak Computerized Valuation Service and obtained AutoTrak's valuation as to the actual cash value of plaintiff's Mustang.

The AutoTrak valuation listed the original equipment and cost guide for a 1983 Ford Mustang GL two-door hatchback and provided three listings of vehicles "recently sold," none of which had a selling price over $6,000. The AutoTrak system also listed "vehicles currently for sale" and listed the top "asking price" at $7,100. Finally, the AutoTrak provided its mathematical valuation, stating: "Based on the AUTOTRAK MATHEMATICAL MODEL, the automobile with options and conditions as described above is predicted to have an Actual Cash Value on February 1, 1985 of . . . $6,279."

Rossel also telephoned automobile dealerships soliciting quotations of prices for comparable vehicles on their lots, and her handwritten notes concerning those conversations are on the AutoTrak valuation form and in her diary. She researched automobile advertisements published in local newspapers in order to determine the "going rate" for comparable vehicles.

Rossel called Security Pacific Bank, which had financed the purchase of the Mustang, to determine if the bank would accept a substitution of pink slips in the event that plaintiff would accept a replacement vehicle. The bank agreed. Rossel then attempted to arrange with the dealer, Rufus Hook, to allow plaintiff to substitute a replacement vehicle; the dealer accepted the proposition on the condition that the substitute vehicle be selected from Hook's own inventory. As stated by Rossel in her declaration, she located a "mechanically superior Mustang with more optional equipment than plaintiff's original vehicle as a suitable replacement" and offered plaintiff the replacement vehicle. He rejected the offer of the replacement vehicle.

The testimony and diary notes of Rossel specifically reflect the fact that plaintiff refused the replacement vehicle and asked Allstate for its best offer as follows: "Called insured after hours and advised. He doesn't want to deal with Rufus Hook and requests Allstate make the best offer we can and check out what the bank will do." On February 18, 1985, plaintiff agreed to the cash settlement offered, in that he did not dispute it. Rossel's diary states: "Insured has decided to take the loss and pay the difference."

Based on the data which Rossel had obtained, she was given authority to offer and did offer plaintiff $7,030.83 minus the insured's $250 deductible, yielding a final settlement of $6,780.83. On February 20, 1985, 28 days after the loss, Allstate issued a draft for $6,780.83, the amount which plaintiff had not disputed.

The next communication Allstate received from plaintiff was a letter dated March 21, 1985, which referred to the cancellation by Rufus Hook of the credit life insurance policy and the fact that the premium refund had been paid to the bank. The letter failed to dispute Allstate's payment or otherwise question it. According to plaintiff's deposition, he had no recollection whether any other letters had been written by him to Rossel. Her diary reflects no communication from plaintiff after March 21, 1985. She testified at her deposition that at no time did she believe that plaintiff disputed the amount of the settlement Allstate had paid. Moreover, plaintiff, *in his deposition,* admitted that he did not know whether Rossel knew he disputed the amount Allstate had paid.

The only communication to Allstate raising any dispute over the amount paid (reflecting the actual cash value of the car) was a letter dated October 9, 1985 (seven months after Allstate's payment), from plaintiff's counsel, John A. Sandquist, Esq., threatening to sue Allstate for bad faith in failing to advise its insured (plaintiff) as to his right to an appraisal on the issue of the actual cash value of the vehicle.

Actually, plaintiff never requested an appraisal, available under the terms of the policy. As a consequence, Rossel had not advised plaintiff of this policy provision, because, in her words, "There was no need to."

From this evidentiary presentation, Allstate and Rossel distilled and filed the following separate statement of undisputed material facts, all as contemplated by section 437, subdivision (b) of the Code of Civil Procedure:

"1. Plaintiff Twaite's 1983 Mustang GL with V-6 engine, AM/FM stereo and wire caps was valued by the January/February 1985 issue of the Kelley Blue Book at $5,725 (wholesale), $7,275 (retail).

"2. Plaintiff Twaite's 1983 Mustang GL with V-6 engine, AM/FM stereo and wire caps was valued by the November/December 1984 issue of the Kelley Blue Book as $5,825-$7,545.

"3. Allstate began adjustment of plaintiff Twaite's claim immediately after the January 23, 1985 accident.

"4. Allstate located and offered plaintiff Twaite a replacement vehicle.

"5. Allstate tendered a $6,780.83 check 28 days after the date of loss.

"6. Plaintiff never requested arbitration or appraisal.

"7. No Allstate coverage exists for the $495 service contract and for the $860 credit insurance.

"8. Susan Rossel treated plaintiff with respect at all times during the handling of plaintiff's claim.

"9. Allstate never denied plaintiff's claim."

Opposite each of the foregoing statements was a corresponding recitation of the precise evidentiary basis for the statement, together with where such evidence could be found in the papers filed in support of the motion.

In his filing in opposition to the motion for summary judgment, plaintiff included a lengthy dissertation entitled "Separate Statements of Facts in Dispute." However, in actuality this item was mostly an argumentative refutation of defendants' statement of undisputed facts. At the conclusion of such filing, plaintiff did include a series of recitations entitled "Other Material Facts in Dispute" as follows:

"10. Defendant never offered Plaintiff a fair or reasonable value for his vehicle.

"11. Defendant, Allstate, never advised Plaintiff of his right to arbitration or appraisal; and Defendant, Susan Rossel, admitted that she did not advise Plaintiff of his right to arbitration or appraisal.

"12. Defendant never made a Good Faith offer to settle Plaintiff's claim; the amount offered, without advising Plaintiff of his right to arbitration or appraisal, constituted an act of Bad Faith as a matter of law; and Defendant's conduct was malicious and despicable, done with conscious disregard of Plaintiff's rights."

Next followed 12 pages of Points and Authorities and a declaration subscribed by Edward L. Solomon, a paralegal in the office of counsel for plaintiff; however, it dealt only with contacts he had had by telephone with counsel for Allstate and Rossel and *did not refer to any facts related to how Rossel had investigated and otherwise handled plaintiff's claim.*

Allstate and Rossel in turn filed a massive "Reply Brief" in response to the opposition noted. Along with this filing, plaintiff's full deposition was lodged with the court.

The court, before argument of the matter, had made a tentative ruling on the motion. In this tentative ruling, with reference to defendants' specification of nine issues being without substantial controversy (*ante*), the court stated that it was prepared to grant the motion as to all except numbers three and four.[2] During the course of the argument, counsel for plaintiff objected variously to consideration of certain evidence contained in the papers filed in support of the motion, but there never was a ruling on any of such objections. Otherwise, there was no evidence actually offered during the hearing. After extended argument, the court changed its tentative position and decided to grant the motion as to all issues, with the result that summary judgment could be and was entered.

Thereafter, plaintiff moved for reconsideration and for a new trial. In this connection, plaintiff urged the ground of "newly discovered evidence" but made no showing as to why such evidence was not available earlier as part of the presentation in opposition to the motion for summary judgment. The motions for reconsideration and for a new trial were eventually submitted without oral argument and then denied. This appeal followed.

## Discussion

### I

In his assignments of error on appeal, plaintiff demonstrates a misconception of what is involved in reviewing a summary judgment and the proceedings which led up to it. Before turning to the actual review of the trial court record appropriate to cases such as this one, we note plaintiff's contentions on appeal.

First, "The Trial Court Erred By Failing to Rule Upon Appellant's Proper Written And Oral Objections To Respondents' Improper Evidence; And Said Written And Oral Objections Should Have Been Sustained. CCP, § 437c; CRC Rules 343, 345."

Second, "In Hearing A Motion For Summary Judgment, The Trial Court Lacks The Discretion To Try The Case On Its Merits. CCP § 437c(c); *Lipson* v. *Superior Court* of Orange County (1982) 31 Cal.3d 362, 374, 182 Cal.Rptr. 629."

Third, "Appellant's Motion For Reconsideration, Or In The Alternative, For New Trial And To Set Aside Judgment, Should Have Been Granted;

---

[2] For easy reference, No. 3 reads, "On or about February 18, 1985, Allstate tendered payment to plaintiff Twaite in the amount of $6,780.83 representing the $7,030.83 actual cash value of the automobile minus a $250 deductible; such payment was reasonable as a matter of law."

No. 4 reads, "Allstate's investigation conducted in order to ascertain the actual cash value of plaintiff's automobile was reasonable as a matter of law."

The Trial Court Erred By Denying Said Motions, Apparently Construing The Rules Of Evidence Strictly Against The Opposing Party And Liberally In Favor Of The Moving Party. CCP § 473, 1008, 657, 437c."

Each of these three arguments is without merit and can be readily dispensed with. ■ As to the first, a court does not err by "failing" to rule on an evidentiary objection. It is up to counsel raising the objection to make a record. Beyond that, the objections were meaningless, if not frivolous, in that they were directed at matters of relevance well beyond the critical or core allegations of plaintiff's own complaint.

As to the second, the trial court did not "try" the case, i.e., it did not make any findings of fact. It simply made a routine ruling as a matter of law on defendants' motion.

■ As to the third, the trial court correctly denied the motions for reconsideration and for a new trial because plaintiff made no showing under section 1008 of the Code of Civil Procedure to explain why the so-called "newly discovered" evidence was not available to plaintiff at the time of his presentation in opposition to the motion for summary judgment.

## II

As part of this phase of the discussion, we are constrained to point out that plaintiff, along with an increasing number of litigants who appear before us, lacks an accurate insight into the decisional process of the trial court in ruling upon a motion for summary judgment.

■ Whenever a party makes a motion for summary judgment, the determination of that motion necessarily begins with reference to the issues framed by the pleadings. In the case here, plaintiff's complaint originally consisted of five counts. Two of those were eliminated at the demurrer phase, leaving only counts one, three and five. Count one, by its very title, charged Allstate with a "bad faith" breach of contract, i.e., a breach of the implied covenant of good faith and fair dealing implicit in every contract of insurance. Count three charged Allstate with conduct amounting to a breach of duties arising under section 790.03 of the Insurance Code. Count five charged both Allstate and Rossel with negligent infliction of emotional distress.

Thus, reduced to the bare essentials, because there are no disputed extrinsic facts, the only issues of fact presented by the pleadings were: (1) whether, as to count one, the behavior of Allstate constituted common law bad faith; (2) whether, as to count three, the behavior of Allstate constituted a

breach of the statutory duties noted; and (3) whether, as to count five, the behavior of either Allstate or Rossel or both amounted to negligence which proximately caused the infliction of emotional distress. Accordingly, the issues, as framed by the pleadings, presented for determination by the trial court, through reference solely to the contents of the filings before it, were narrow indeed.

Turning to the proceeding itself, a party may move for summary judgment "if it is contended that the action has no merit. . . ." (Code Civ. Proc., § 437c, subd. (a).) In the first instance, this kind of motion determines "whether the moving party is entitled to judgment as a matter of law. [Citation.]" (*Powell* v. *Standard Brands Paint Co.* (1985) 166 Cal.App.3d 357, 361-362 [212 Cal.Rptr. 395].)

■ More particularly, only if it can be determined that the moving party's declarations " 'considered in light of the issues raised by the pleadings . . . would, standing alone[,] support the summary judgment motion does the court look to any . . . counter-declarations.' " (*Conn* v. *National Can Corp.* (1981) 124 Cal.App.3d 630, 639 [177 Cal.Rptr. 445], quoting from *Residents of Beverly Glen, Inc.* v. *City of Los Angeles* (1973) 34 Cal.App.3d 117, 127 [109 Cal.Rptr. 724].)

The foregoing is routine stuff for easy application to the case here. Moreover, this is one of those summary judgment cases where there is absolutely no dispute over the extrinsic, observable facts, and thus one which, if the facts were right for it, could be determined as a matter of law. In other words, in each of the three counts remaining after the demurrer, the issue boiled down to one of ultimate fact which, given a sufficient state of the evidence, could be resolved in favor of Allstate and Rossel as a matter of law.

### III

As to the first count, the ultimate fact issue, framed by the pleadings, was whether, on the undisputed extrinsic facts, there had been a breach of Allstate's implied covenant of good faith and fair dealing. In the language of earlier precedents, the inquiry germane to such an issue is whether the insurer's conduct has been "unreasonable" (*Austero* v. *National Cas. Co.* (1978) 84 Cal.App.3d 1, 27 [148 Cal.Rptr. 653], disapproved on other grounds in *Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 824 [169 Cal.Rptr. 691, 620 P.2d 141]). ■ However, as the law in this area has evolved, it is now more accurate to measure the insurer's conduct, as it relates to investigating and paying claims, in terms of having been "with" or

"without proper cause." (*California Shoppers, Inc.* v. *Royal Globe Ins. Co.* (1985) 175 Cal.App.3d 1, 54 [221 Cal.Rptr. 171].)

■ On the undisputed extrinsic facts, which we have recited above at length to demonstrate the total absence of any tortious behavior by either Allstate or Rossel, the investigation and payment of plaintiff's claim, as such things go, was nothing short of exemplary. What happened here does not even remotely approach the threshold of inquiry present in either *Austero* or *California Shoppers*. Stated in ultimate terms, as a matter of law, Allstate here did not breach the implied covenant of good faith and fair dealing. More particularly, with reference to plaintiff's repeated contention that Allstate failed to advise plaintiff of his right to an appraisal, the ready answer is that such "failure" to do so was "with proper cause." Plaintiff at no time disputed the amount of the tender; thus, the occasion to advise plaintiff of his right to an appraisal never arose. In other words, if plaintiff accepted tender of a specific amount, representing Rossel's determination of the cash value of the Mustang at the time of the collision, less the deductible, and plaintiff did not question the adequacy of the tender, what would have been the point of having an appraisal made? The question plainly implies the answer.

At oral argument, counsel for plaintiff persisted in contending that the issue of fact raised by both the pleadings and his opposition to the motion was the actual arithmetic cash value of the Mustang at the time it was totalled. In his brief, plaintiff tangentially makes the same argument. He contends therein that "evaluation of Appellant's vehicle . . . must therefore be considered a disputed issue." He then argues on a different salient that Allstate's evidence "in support of its Motion for Summary Judgment *supports Appellant's position* that the method used for vehicle evaluation was most *unreasonable*. No counter affidavits were necessary." (Plaintiff's italics.)

The foregoing calls for several observations, somewhat disjunctive in nature. We have meticulously scrutinized the first count of plaintiff's complaint to ascertain if he actually alleged a breach of the terms of the policy as distinguished from a breach of the implied covenant of good faith and fair dealing. By this we sought to inquire whether plaintiff had alleged a breach of the insurance policy duty to pay the "actual cash value of the property . . . at the time of the loss."

■ To state a cause of action for breach of contract, it is absolutely essential to plead the terms of the contract either in haec verba or according to legal effect. Nowhere in count one did plaintiff allege the terms of the insurance policy which at oral argument his counsel contended had been

breached by a purported failure to pay the correct, arithmetic cash value of the Mustang as of the date it was totalled. This deficiency in pleading was not cured by the allegation that "Allstate by not negotiating a reasonable payoff of the insured vehicle and the release of the lienholder has caused plaintiff special damages in excess of $2,600." Further, on the issue of breach, even assuming that the language quoted did cure the failure to allege specifically the terms of the contract, the complaint alleged, at least by implication, that plaintiff had accepted the amount tendered by failing to dispute the $6,780.83 figure.

Otherwise, looking at count one in terms of the basic concept of separately stating causes of action, the pleading is so lavishly larded with the prototypical language describing the unreasonable behavior by Allstate (Rossel) in arriving at the $6,780.83 figure, that it is difficult not to conclude that what the pleader was trying to do in count one was only to allege a breach of the implied covenant of good faith and fair dealing. Accordingly, we hold that count one of the complaint did not allege a breach of the insurance contract itself.

Thus, the only material issue of fact raised by the pleadings, as to count one, was whether there had been a breach of the implied covenant, with the inescapable consequence that "evaluation of Appellant's vehicle" never was an issue of fact raised by the pleadings. The only issue of fact raised by count one was whether Allstate's (Rossel's) conduct in arriving at the valuation tendered, in the language of *California Shoppers,* was "with proper cause."[3]

The next observation to be made with regard to plaintiff's bald assertion in his brief that Allstate's (Rossel's) "method used for vehicle evaluation was most unreasonable [with the result that] [n]o counter affidavits were necessary" (original italics deleted) is that his conclusion that no counter affidavits were necessary was foolhardy, if not reckless, in terms of the position of a party opposing a motion for summary judgment. In other words, by opting not to file counterdeclarations on the issue raised by the count one pleadings, he chose to stand or fall on the legal determination of whether *Allstate's* showing in support of the motion established that its investigation and handling of the claims did not constitute a breach of the implied covenant.

---

[3] The scrutiny of count one, as above noted, also contemplated the always present possibility, should a breach of the express contract have been alleged, along with breach of the implied covenant, that the plaintiff could prevail in proving breach of the express contract, but fail in proving breach of the implied covenant. That happened in both *Austero* and *California Shoppers.*

We have already indicated that the steps taken to reach such determination did not, even remotely, represent a close case of bad faith. Everything which Allstate did, through its employee Rossel, was substantially within the *California Shoppers* standard of behavior, i.e., "with proper cause."

Accordingly, with reference to Allstate's specification of issues No. 3 and No. 4 as being without substantial controversy, the trial court correctly ruled that they were. The issue there was a matter of law, as conceded by plaintiff, who stated that he saw no need to file counteraffidavits as to those issues.

## IV

Turning to count three, the identical behavior of Allstate (and Rossel) is called up for scrutiny, this time, however, for measurement against Allstate's duties arising under section 790.03, subdivision (h) of the Insurance Code. In comparing the nature and extent of the respective duties imposed by the implied covenant with those imposed by statute, it has been observed that the Unfair Practices Act (Ins. Code, § 790 et seq.) "is a codification of the tort of breach of the implied covenant of good faith and fair dealing as applied to insurance." (*Kelly* v. *Farmers Ins. Exchange* (1987) 194 Cal.App.3d 1, 6 [239 Cal.Rptr. 259].)

Pronouncements of the concept just noted have long since appeared in the decisions, but such pronouncements have not been necessary to the results reached in those cases.

In *Richardson* v. *GAB Business Services, Inc.* (1984) 161 Cal.App.3d 519 [207 Cal.Rptr. 519], the court said, "It appears to us that the actionable wrong of 'bad faith' contained in section 790.03 is a codification of the earlier tort of bad faith, which historically is a breach of the duty of good faith and fair dealing which is implied in every contract. (*Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751 [128 P.2d 665]; *Brown* v. *Superior Court* (1949) 34 Cal.2d 559 [212 P.2d 878]; *Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654 [328 P.2d 198, 68 A.L.R.2d 883]; *Crisci* v. *Security Ins. Co.* (1967) 66 Cal.2d 425 [58 Cal.Rptr. 13, 426 P.2d 173].) Section 790.03 merely enumerates those practices which are actionable and extends the cause of action to third party claimants, such as a third party's tort claim against a liability insurance carrier for a tortfeasor. Thus, the insurance contract itself is the basis for holding insurance companies and those engaged 'in the business of insurance' to a higher standard when negotiating and settling claims." (*Id.,* at p. 524.)

However, the issue resolved in that case was whether a self-insured corporation was subject to these Insurance Code provisions. The court held

that it was not; hence, just what standard was to be used in measuring whether there had been any such violations was no part of the basis for the decision's result.

In *General Ins. Co.* v. *Mammoth Vista Owners' Assn.* (1985) 174 Cal.App.3d 810 [220 Cal.Rptr. 291], the court said, "The actionable wrong contained in Insurance Code section 790.03, subdivision (h), is merely a codification of the tort of breach of the implied covenant of good faith and fair dealing as applied to insurance. (*Richardson* v. *GAB Business Services, Inc.* (1984) 161 Cal.App.3d 519, 524 [207 Cal.Rptr. 519].) 'Section 790.03 merely enumerates those practices which are actionable and extends the cause of action to third party claimants, . . . ' (*Ibid.*; see *Royal Globe Ins. Co.* v. *Superior Court* (1979) 23 Cal.3d 880, 888 [153 Cal.Rptr. 842, 592 P.2d 329].)

"Under common law, every insurer has an implied-in-law duty to act fairly and in good faith in handling the claim of an insured. (*Gruenburg* [*sic*] v. *Aetna Ins. Co.* (1973) 9 Cal.3d 566, 573-574 [108 Cal.Rptr. 480, 510 P.2d 1032].) Tortious violation of that duty may occur in several ways, including failure 'without proper cause, to compensate its insured for a loss covered by the policy' (*Gruenberg,* at p. 574); failure to properly investigate a claim (*Egan* v. *Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819 [169 Cal.Rptr. 691, 620 P.2d 141]); and failure to accept a reasonable settlement within policy limits (*Comunale* v. *Traders & General Ins. Co.* (1958) 50 Cal.2d 654, 661 [328 P.2d 198, 68 A.L.R.2d 883].)" (*General Ins. Co.* v. *Mammoth Vista Owners' Assn., supra,* 174 Cal.App.3d 810, 822-823.)

The pivotal issue in *General Ins.* was whether a surety is subject to regulation by these provisions of the Insurance Code. The court went on to conclude that a surety can be charged with violation of the Unfair Practices Act. However, the decision does not refer in any respect to the nature and extent of the conduct in which the surety must engage before being in violation of the act.

The court in *Kelly,* without articulating a standard against which to measure the insurer's conduct, sent the case back to the trial court to determine if there had been a statutory violation, more particularly to determine if "a triable issue of fact exists as to whether Farmers' refusal to pay the $25,000 policy limit unless United released its claim constituted an unfair settlement practice." (*Kelly* v. *Farmers Ins. Exchange, supra,* 194 Cal.App.3d 1, 9-10.)

█ Now that the rule is recognized that Insurance Code section 790.03, subdivision (h), "is merely a codification of the tort of breach of the implied

covenant of good faith and fair dealing as applied to insurance" (*General Ins., supra,* 174 Cal.App.3d at p. 822), there is precedent readily at hand for transposing from the *common law cases* the standard of behavior there applied for a like application in the *statutory cases.*

In *California Shoppers, Inc.* v. *Royal Globe Ins. Co., supra,* 175 Cal.App.3d 1, we were dealing with a situation in which the insurer had initially declined to accept tender of the defense because of a mistaken belief, induced by the insured, that coverage did not extend to the insured. There we said, "In determining what further must appear for there to be bad faith, the cases reflect a wide variety of language, increasingly identifiable with particular categories of cases. After variously recognizing the rule quoted, the *Gruenberg* court said 'where . . . [the insurer] fails to deal fairly and in good faith with its insured by refusing, *without proper cause,* to compensate its insured for a loss covered by the policy, such conduct may give rise to a cause of action in tort for breach of an implied covenant of good faith and fair dealing.' (*Gruenberg* v. *Aetna Ins. Co., supra,* 9 Cal.3d 566, 574, original italics deleted, italics added.) Of course, the converse of 'without proper cause' is that declining to perform a contractual duty under the policy *with proper cause* is not a breach of the implied covenant. [Italics in original.] (See *Seaman's Direct Buying Service, Inc.* v. *Standard Oil Co.* (1984) 36 Cal.3d 752, 770 [206 Cal.Rptr. 354, 686 P.2d 1158].)

"Translated into more specific terms within the recognized general standard, then, *Gruenberg* stands for the proposition that, before an [insurer] can be found to have acted tortiously, i.e., in bad faith, in refusing to bestow policy benefits, it must have done so 'without proper cause.'

"That this language best articulates the evolving standard against which an alleged breach of the implied covenant is to be measured is confirmed in *Neal* v. *Farmers Ins. Exchange* (1978) 21 Cal.3d 910 [148 Cal.Rptr. 389, 582 P.2d 980], where the Supreme Court actually quoted the *Gruenberg* 'without proper cause' language in its analysis of whether the insurer had breached the implied covenant. (*Id.,* at pp. 920-921; accord, *Hanson* v. *Prudential Ins. Co. of America, supra,* 772 F.2d 580, 584, citing *Neal* and *Gruenberg* for this proposition; *Safeco Ins. Co. of America* v. *Guyton* (9th Cir. 1982) 692 F.2d 551, 557, fn. 7.)" (*California Shoppers, Inc.* v. *Royal Globe Ins. Co., supra,* 175 Cal.App.3d 1, 54-55.)

Our turning to the *Gruenberg* "without proper cause" standard for use in reviewing here the statutory count (three) is reinforced by *Kelly*'s citation of *General Ins.* as the precise authority for its categorical pronouncement of the proposition that "[s]ection 790.03, subdivision (h), is a codification of the tort of breach of the implied covenant of good faith and fair dealing as

applied to insurance. (*General Ins. Co.* v. *Mammoth Vista Owners' Assn.* (1985) 174 Cal.App.3d 810, 822 . . . .)" (*Kelly* v. *Farmers Ins. Exchange,* supra, 194 Cal.App.3d 1, 6.) We say "reinforced," because at page 823 of *General Ins.,* included in language we have already quoted, the court actually relies upon the *Gruenberg* rationale when it says, "[t]ortious violation of that duty may occur in several ways, including failure 'without proper cause, to compensate its insured for a loss covered by the policy.' " (*General Ins. Co.* v. *Mammoth Vista Owners' Assn.,* supra, 174 Cal.App.3d 810, 823.) Thus, as we observed in *California Shoppers,* "Translated into more specific terms within the recognized general standard, then, *Gruenberg* stands for the proposition that, before an [insurer] can be found to have acted tortiously, i.e., in bad faith, in refusing to bestow policy benefits, it must have done so '*without proper cause.*' " (*California Shoppers, Inc.* v. *Royal Globe Ins. Co.,* supra, 175 Cal.App.3d 1, 54-55, italics added.)

■ Measured against this standard, Allstate's handling of plaintiff's claim, as a matter of law, was not a violation of section 790.03, subdivision (h) of the Insurance Code. There are 15 paragraphs under subdivision (h), and the undisputed extrinsic facts reflected by defendant Rossel's behavior, all as presented to the trial court and not disputed by plaintiff, do not even come close to being a violation of any of those 15 "unfair claims settlement practices," when measured against the *California Shoppers* standard.

V

This brings the discussion to the fifth count of plaintiff's complaint which charged both defendants with the negligent infliction of emotional distress. Plaintiff's effort here must fail because of two fundamental flaws. ■ First, as a matter of law, there was no negligent conduct here involved by either Allstate or Rossel. Second, and more significantly, the recovery of damages for emotional distress in negligence cases yet remains a limited possibility.

This latter observation calls up for discussion *Commercial Cotton Co.* v. *United California Bank* (1985) 163 Cal.App.3d 511 [209 Cal.Rptr. 551, 55 A.L.R.4th 1017]. In that case the bank had wrongfully, i.e., negligently, debited plaintiff's bank account based upon checks presented for payment bearing unauthorized signatures. The trial court awarded plaintiff the $4,000 necessary to recoup his account plus $20,000 for emotional distress and $100,000 in exemplary damages. On appeal, the court struck the emotional distress damages, noting, "However, while damages for emotional distress unaccompanied by physical injury may be awarded in a tort action arising out of a breach of a covenant of good faith and fair dealing, the injuries suffered must be severe, i.e., substantial or enduring as distinguished

from trivial or transitory. (*Young* v. *Bank of America* (1983) 141 Cal.App.3d 108, 114 [190 Cal.Rptr. 122].)" (*Id.* at p. 517.)

In the case here, the evidence before the trial court in the form of answers to interrogatories and in plaintiff's deposition indicated that plaintiff was angry and upset; however, as held in *Commercial Cotton,* as a matter of law, such feelings do not qualify a plaintiff to a recovery of damages for emotional distress. In sum, based upon the foregoing analysis, directed at the three surviving counts of plaintiff's complaint, the trial court's granting of the motion for summary judgment was eminently proper.

## DISPOSITION

The judgment is affirmed. Allstate and Rossel shall recover their costs on appeal.

Dabney, J., and Hollenhorst, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 21, 1990.