277 P.3d 789

Kenneth John NARDELLI and Tammy M. Nardelli, husband and wife, Plaintiffs/Appellants/Cross–Appellees,

v.

METROPOLITAN GROUP PROPERTY AND CASUALTY INSURANCE COMPANY, a Rhode Island corporation; Metropolitan Property and Casualty Insurance Company, a Rhode Island corporation, Defendants/Appellees/Cross–Appellants.

No. 1 CA–CV 10–0350.

Court of Appeals of Arizona, Division 1, Department C.

May 1, 2012.

Dawson & Rosenthal, P.C. By Steve C. Dawson and Anita Rosenthal, Phoenix and Dillenburg Law Offices By Richard A. Dillenburg, Tempe, Attorneys for Plaintiffs/Appellants/Cross–Appellees.

Steptoe & Johnson LLP By Floyd P. Bienstock, Bennett Evan Cooper, Douglas Janicik and Tim Strong, Phoenix, Attorneys for Defendants/Appellees/Cross–Appellants.

## OPINION

NORRIS, Judge.

¶ 1 This appeal and cross appeal arise out of a lawsuit filed by Plaintiffs/Appellants/Cross–Appellees, Kenneth and Tammy Nardelli ("the Nardellis"), against Defendants/Appellees/Cross–Appellants, Metropolitan Group Property and Casualty Insurance Company and Metropolitan Property and Casualty Insurance Company (collectively "MetLife"), for breach of the implied covenant of good faith and fair dealing. After a jury awarded the Nardellis $155,000 in compensatory damages and $55 million in punitive damages, the superior court upheld the jury's award of compensatory damages, but reduced the punitive damages to $620,000.

¶ 2 In their appeal, the Nardellis principally argue the superior court should not have reduced the punitive damages, and in its cross-appeal, MetLife principally argues the evidence does not support bad-faith liability or punitive damages. Alternatively, it argues we should reduce the superior court's punitive damages award even further.

¶ 3 We agree with the Nardellis sufficient evidence supports liability and punitive damages. We agree with MetLife, however, the amount of punitive damages should match the amount of compensatory damages. Therefore, we affirm the jury's verdict on

bad-faith liability and the Nardellis' entitlement to punitive damages, but reduce the amount of punitive damages to $155,000.[1]

## FACTUAL OVERVIEW AND PROCEDURAL BACKGROUND [2]

¶ 4 In December 2001, the Nardellis, with financing from a lender, bought a new 2002 Ford Explorer for $35,750 from Earnhardt Ford. The Nardellis obtained comprehensive insurance coverage for the Explorer from MetLife.

¶ 5 On September 3, 2002, the Explorer was stolen. The Nardellis reported the theft to MetLife and a MetLife claims adjustor, Steve Simpson, told them he would be unable to adjust their claim as a total loss before the expiration of two weeks. According to Ken Nardelli, Simpson also advised the Nardellis they could "shop around," but should not purchase a replacement vehicle until the two weeks had expired.

¶ 6 On September 18, 2002, the Explorer was found abandoned in Mexico, with slit seats, cut wires, a torn interior, and what turned out to be a ruined engine. The front dashboard vehicle identification number ("VIN") plate and the driver's-side-door VIN sticker had also been torn off.

¶ 7 MetLife arranged to have the Explorer delivered to a tow yard in Ajo, Arizona. It also hired an independent appraiser to inspect the Explorer in Ajo, and the appraiser initially estimated the damage would cost $815 to repair. When Ken Nardelli called the Ajo tow yard, however, a tow-yard employee told him the VINs and the battery were missing and the appraiser had not even lifted the hood.

¶ 8 The Nardellis then elected to have the Explorer towed from Ajo to the Earnhardt Ford body shop in Gilbert, Arizona for an inspection. Ken Nardelli went to Ajo to accompany the tow-truck driver. The tow-truck driver tried to put the Explorer in neutral and the gear shift broke off in his hand. The tow-truck driver then had to drag the Explorer onto the tow truck for the trip to Gilbert.

¶ 9 The next day, October 8, 2002, the Nardellis met with Earnhardt body shop manager "Mike," tried to start the engine, but quickly turned it off when it made a loud knocking noise. Ken Nardelli testified Mike told him he thought the Explorer would need a new engine.

¶ 10 Three days later, Ken Nardelli, Mike, and MetLife field appraiser Jerry Proctor inspected the Explorer at Earnhardt. Ken Nardelli testified he was very upset because things were falling off the Explorer as he touched it. Proctor, however, testified, "I wasn't foreseeing anything else [would] come up. I could see it not being a total loss," and estimated the damages at this point were between $7,000 and $8,000. Relying on Proctor, his supervisor wrote in the claim file, "Jerry states vehicle should not total." Mike and Proctor then agreed Earnhardt would tear down the engine and make a closer inspection of the Explorer.

¶ 11 On October 25, 2002, after Earnhardt finished its inspection and concluded the Explorer needed a new engine and other repairs, the Nardellis again met at Earnhardt with Mike and Proctor to review the repairs Earnhardt had identified. To their dismay, the Nardellis discovered additional damage. Ken Nardelli testified "it got a little ugly," because, as the Nardellis pointed out the additional damage, Proctor told Tammy Nardelli she was "nitpicking." At the end of the inspection, Proctor estimated the cost to repair the damage was $11,009, and told the Nardellis MetLife would not total the Explorer. The Nardellis disagreed vigorously, because they had found more damage each time they saw the Explorer, and believed it had been trashed.

---

1. In a separate memorandum decision, *Nardelli v. Metropolitan Group Property and Casualty Insurance Company*, 1 CA–CV 10–0350, 2012 WL 1537415 (Ariz.App. May 1, 2012), filed simultaneously with this opinion, we address the parties' other arguments on appeal. *See* Ariz. R. Sup.Ct. 111(h); ARCAP 28(g).

2. Except as otherwise discussed in this decision, we review the facts in a light most favorable to upholding the jury's verdict. *Sec. Title Agency, Inc. v. Pope*, 219 Ariz. 480, 490, ¶ 51, 200 P.3d 977, 987 (App.2008) (internal citation omitted).

¶ 12 Under their policy (excluding any endorsements, *see infra* ¶ 43), in the event of a loss, MetLife was required to pay the lesser of (1) the actual cash value of the Explorer at the time of the loss, or (2) the cost to repair or replace the Explorer "with other of like kind and quality." Thus, under the policy, only if the Explorer could be repaired or replaced to its pre-loss condition could Met-Life select the second option.

¶ 13 Dissatisfied with MetLife's decision to repair and not total the Explorer, Ken Nardelli spoke to managers in MetLife's claims department—Glenda Woolley and David Oyler—by telephone on October 29, 2002. He testified Woolley and Oyler gave him the first "official" word "[t]he decision [had] been made.... That's it. The [Explorer was] not getting totaled," and that Woolley and Oyler "were mad at [him] because [he] was questioning them ... and, their agenda was set."

¶ 14 Ken Nardelli called back the next day and spoke to Woolley and Oyler's supervisor, Mike Maurer, who, unbeknownst to Ken Nardelli, had been listening to his telephone conversation with Woolley and Oyler the day before. Although disputed, Ken Nardelli testified Maurer told him MetLife was sending him an appraisal, a check, and a letter, and said "you take your check, you take the letter, you take your truck, and you do whatever you want." Consistent with his testimony, Ken Nardelli wrote, in a diary he maintained throughout his dealings with MetLife, Maurer told him, "the check is in the mail—do whatever you want."

¶ 15 After MetLife decided the Explorer could be repaired to pre-loss condition, it issued a joint check to the Nardellis and their lender for $10,759.13, which was the cost to repair the truck as estimated by Proctor—based, in part, on information from Earnhardt—as of October 25, 2002 (less a $250 deductible). The Nardellis turned the check over to Earnhardt and voluntarily allowed the lender to repossess the Explorer.

¶ 16 As discussed above, after extensive briefing, the court reduced the jury's award of punitive damages to $620,000—a ratio of 4:1 to the $155,000 compensatory damages. The court subsequently denied MetLife's renewed motions for judgment as a matter of law on bad-faith liability and the Nardellis' entitlement to punitive damages. The court then entered an amended judgment in the Nardellis' favor and awarded them a total of $1,571,417.58, which included sanctions under Arizona Rule of Civil Procedure 68 and post-judgment interest.

## DISCUSSION

¶ 17 Although phrasing and organizing the issues somewhat differently, the parties focus their arguments on appeal on the jury's finding of bad-faith liability, its decision to award punitive damages, the superior court's reduction of the punitive damages, and the court's denial of MetLife's renewed motions for judgment as a matter of law. For clarity, we group the arguments raised by the parties by subject matter, rather than by appeal. Thus, we begin with whether the superior court should have granted MetLife's motions for judgment as a matter of law on, first, bad-faith liability and, second, punitive damages. As explained below, we answer each question, "no."

### I. Bad–Faith Liability and Entitlement to Punitive Damages

#### A. Standard of Review

¶ 18 We review de novo the superior court's denial of MetLife's motions for judgment as a matter of law. *See Pope*, 219 Ariz. at 490, ¶ 51, 200 P.3d at 987 (citing *Shoen v. Shoen*, 191 Ariz. 64, 65, 952 P.2d 302, 303 (App.1997)). "The superior court properly grants [judgment as a matter of law] 'only if the facts presented in support of a claim have so little probative value that reasonable people could not find for the claimant.'" *Id.* "We view 'the evidence in a light most favorable to upholding the jury verdict' and will affirm 'if any substantial evidence exists permitting reasonable persons to reach such a result.'" *Id.* (quoting *Hutcherson v. City of Phoenix*, 192 Ariz. 51, 53, ¶ 13, 961 P.2d 449, 451 (1998)).

#### B. Bad–Faith Liability

¶ 19 An insurer acts in bad faith when it unreasonably investigates, evaluates, or

processes a claim (an "objective" test), and either knows it is acting unreasonably or acts with such reckless disregard that such knowledge may be imputed to it (a "subjective" test). *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 238, ¶ 22, 995 P.2d 276, 280 (2000); *Miel v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 104, 110, 912 P.2d 1333, 1339 (App.1995); *Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 153 Ariz. 95, 104, 735 P.2d 125, 134 (App.1986).

¶ 20 Here, there is substantial evidence from which a reasonable jury could find Met-Life acted in bad faith in making at least three decisions: deciding to repair rather than total the Explorer, sending the Nardellis a check for an amount that did not cover the repair costs, and failing to advise them of policy provisions relevant to their claim.

### i. Repair Versus Total

¶ 21 During trial, MetLife claims manager Woolley acknowledged the policy required MetLife to total the Explorer if it could not be repaired to pre-loss condition. MetLife argues it could not have acted unreasonably in deciding not to total the Explorer, however, because it was entitled to and did rely on Earnhardt's representations the Explorer could be repaired to pre-loss condition. It points out the Nardellis selected Earnhardt, Earnhardt is "a Ford dealership ... Ford factory trained ... [and] a good, reputable shop," and Earnhardt's estimate, which Proctor used in completing his estimate on October 25, showed repair costs would be less than half the actual cash value of the Explorer.

¶ 22 We do not disagree that MetLife, in making its decision to repair and not total the Explorer, was entitled to consider Earnhardt's opinions. *Cf. Montoya Lopez v. Allstate Ins. Co.*, 282 F.Supp.2d 1095, 1102–03 (D.Ariz.2003) (not *per se* unreasonable for insurer to rely on expert's report when no showing it ignored other evidence). But the Nardellis presented conflicting evidence re-

garding whether Earnhardt actually represented it could repair the Explorer to pre-loss condition.

¶ 23 Although Proctor testified Mike told him Earnhardt could repair the Explorer to pre-loss condition, Ken Nardelli testified Mike told him, "I'll do the best possible job I can do for you to get this truck back in the condition it was before it was stolen ... but I am going to tell you right now, it isn't going to happen.... If this [was] my truck, I wouldn't be taking it back." Consistent with this testimony, Mike explained to the jury, "[w]e try and repair everything to the best of our ability to be pre-loss. Sometimes it comes out that way where it works out wonderful. Sometimes, you know, it's—you just can't get anything 100 percent. Unfortunately, we're not a factory." He further stated that although he did not "recall telling [Ken Nardelli the Explorer was] never going to be the same. [He] may have said that," and he "would think that [he] probably would have said, I'll get it back as close as I possibly can, but we're not a factory."

¶ 24 The Nardellis also presented evidence that whether Earnhardt could repair the Explorer to pre-loss condition was doubtful at best. Mike testified "a theft recovery is probably one of the worst vehicles to try and repair," because the extent of abuse to which the vehicle has been subjected is unclear and the vehicle "can just keep coming back [to the shop] four, five, six, eight, ten times" after the initial repairs.

¶ 25 Testimony from subsequent owners of the Explorer[3] confirmed Mike's description of the difficulties in repairing a "theft recovery." Repair records showed the first subsequent owner took the Explorer to a shop nearly every month for repairs, which Mike agreed fulfilled his "prediction that the [Explorer would] never be the same." The second subsequent owner, a retired mechanic, testified he had problems with the transmission and alignment,[4] and called the Explorer

---

3. The first subsequent owner bought the Explorer from Earnhardt after the Nardellis surrendered it to repossession and the second subsequent owner bought it from a dealership in Oklahoma without knowing "the history of the truck."

4. At trial, the parties vigorously disputed whether the Explorer's transmission, like the engine, had been damaged. The testimony also conflicted as to whether the problems this subsequent owner had with the engine and transmission had been caused by the owner's son. It was the jury's task

"a lemon." In addition to this testimony, the Nardellis' forensic engineering expert testified that when an engine is "abused to the degree that there are parts of the piston in the oil pan"—as was the case with the Nardellis' Explorer—repairing to pre-loss condition "becomes a great issue," because "everything is subjected to violent realignment or misalignment."

¶ 26 Further, even assuming Earnhardt represented it could restore the Explorer to pre-loss condition, the Nardellis also presented evidence that, contrary to MetLife's duty to "immediately conduct an adequate investigation, [and] act reasonably in evaluating the claim," *Zilisch*, 196 Ariz. at 238, ¶ 21, 995 P.2d at 280, it ignored other information the Explorer was a likely total loss.

¶ 27 At trial, MetLife claims employees explained they considered a vehicle a total loss when the cost to repair to pre-loss condition, when added to the vehicle's salvage value, equaled or exceeded the vehicle's actual cash value, or when the repair costs came close to 75% of the actual cash value.

¶ 28 MetLife estimated the Nardellis' Explorer had an actual cash value of $24,475. On October 29, 2002, when MetLife unequivocally decided not to total, Proctor had estimated repair costs at $11,009, but also expected Earnhardt would discover additional damage during the repair process that would cost at least $2,000 or $3,000 to repair. *See infra* ¶ 33. Thus, the Nardellis presented evidence Proctor's $11,009 estimate was too low and should have been at least $13,000.

¶ 29 Further, although Proctor's $11,009 estimate included the cost of an engine he described as "new" for $3,330, Mike had advised MetLife a new engine would cost between $4,000 and $5,000,[5] that is, between $700 and $1,700 more than MetLife had esti-mated. In addition, as described below, *see infra* ¶ 37, Proctor's estimate used a labor rate of $40–per–hour for all repairs, but Earnhardt charged approximately $73–per–hour for mechanical work, and Proctor acknowledged he knew MetLife would have to pay the higher labor rate if Earnhardt repaired the Explorer.[6] Thus, even the $13,000 figure may have been too low. Indeed, from this evidence the jury could have determined that, on October 29, 2002, when MetLife firmly rejected the Nardellis' request that it total the Explorer, repair and labor costs ranged from a low of $13,000 to over $16,000[7]—from 53% to 65% of the actual cash value of the Explorer. The jury could have also determined the repair costs would have been even greater because of the additional repairs that, at least, the first subsequent owner had to make and were, as discussed above, *see supra* ¶ 25, described as consistent with the type of damages suffered by a "theft recovery." Thus, at the high end, repair costs were approaching 75% of the actual cash value of the Explorer and, according to MetLife's own internal policies—as described by Proctor—MetLife should have "start[ed] thinking differently" about the Explorer, considered whether it might be a total loss, and investigated a salvage bid.

¶ 30 Yet, in adjusting the Nardellis' claim, MetLife never obtained a salvage bid, insisting it would only do so if the repair costs were close to 75% of the actual cash value of the Explorer. Although a MetLife claims department manager testified salvage bids were usually approximately 25% of the actual cash value, Mike and the Nardellis' insurance expert both testified a salvage bid in this case would have been higher than the average salvage bid because the Explorer was a "current model year." Thus, at the time

to sort through conflicts in the evidence regarding the transmission.

5. Consistent with Mike's estimate, the Nardellis' engineering expert testified a new engine would have cost $4,614.75. For reasons no witness could explain with any certainty, Earnhardt installed a remanufactured engine, which cost $2,884. Although the parties presented conflicting evidence about the cost of an engine for the Explorer, it was up to the jury to decide this issue.

6. Proctor's estimate included 19.2 hours of "mechanical" labor. Thus, at $40–per–hour the mechanical labor costs for this estimate were $768, but would have been $1,401 at Earnhardt's $73–per–hour rate—a difference of $633.

7. The final cost of repairs was approximately $15,000.

MetLife made its final decision to repair and not total, the estimated repair costs were climbing higher and higher, yet it never investigated the value of a potentially substantial salvage bid to determine whether the bid, added to the repair costs, would equal the actual cash value of the Explorer and meet MetLife's total-loss requirements.

¶ 31 In essence, the Nardellis presented substantial evidence that could have caused the jury to find, first, the Explorer could not be repaired to pre-loss condition, second, MetLife ignored other information the Explorer was coming close to a total loss, and third, MetLife failed to investigate a salvage bid to determine exactly how "close" was close. From this evidence, a reasonable jury could conclude it was objectively unreasonable, under these circumstances, for MetLife to insist on repairing the Explorer.

¶ 32 This brings us to the subjective requirement for a bad-faith claim. Did the Nardellis present evidence from which the jury could reasonably find MetLife knew its conduct was unreasonable or acted with such reckless disregard that such knowledge can be imputed to it?

¶ 33 Internally, MetLife employees acknowledged that, with recovered thefts, "as we get into the actual repair process with the shop, then we find other things that we're not aware of," because "[w]e don't know ... exactly what happened to the [vehicle] while it's missing from our policyholder's possession. No one knows that for sure," and they expected to pay what they characterized as "supplements," that is, additional costs incurred to repair the Explorer. MetLife classified recovered thefts on an internal worksheet as a special category of "possible total losses," and a MetLife claims manager agreed "these are situations where [MetLife] feels somebody needs to take a look at these particular elements without regard to dollar value."

¶ 34 Further, Ken Nardelli testified Proctor told him he would obtain a salvage bid

and, although Proctor testified, "I don't know if I promised," he acknowledged he "might have said [he would] look into it," but never did. MetLife claims manager Woolley also testified if MetLife employees had a reason to think they might have been dealing with a total loss, a salvage bid "would probably be something that would be of value."

¶ 35 Thus, the Nardellis also presented substantial evidence from which reasonable jurors could find MetLife knew the Explorer was close to a total loss and repairs would be ongoing, ignored the full range of available information about the amount of damage to the Explorer, acknowledged a salvage bid would be useful in calculating whether it should total but never obtained one, and acted subjectively unreasonably in refusing to total. As *Zilisch* teaches, the duty of "[e]qual consideration of the insured requires more" than this type of investigation and evaluation. 196 Ariz. at 238, ¶¶ 21, 23, 995 P.2d at 280.

### ii. The Check

¶ 36 As described above, on October 31, 2002, MetLife mailed a $10,759.13 check to the Nardellis after it decided it would pay to have the Explorer repaired. Under the Nardellis' policy, as explained by MetLife employees at trial, MetLife was entitled to "pay for the loss in money," but if it did so, it was required to pay the Nardellis the full amount needed to repair the Explorer to pre-loss condition. But, the check MetLife sent to the Nardellis was not for the full amount of the repair costs.

¶ 37 First, MetLife employees, asserting it was standard practice, admitted they knew at the time they sent the check to the Nardellis that it only covered a labor rate which was approximately $30–per–hour less than the mechanical labor rate Earnhardt had estimated and ultimately charged, *see supra* ¶ 29.[8]

---

**8.** Despite knowing Earnhardt's mechanical labor rate was $73–per–hour, MetLife issued the check based on Proctor's October 25 estimate, which, as discussed, used the rate of $40–per–hour, although Proctor insisted he would have changed

the rate after Earnhardt made the repairs. Earnhardt ultimately charged two different labor rates for different mechanical work—$73–per–hour and $68.75–per–hour.

¶ 38 Second, although MetLife presented testimony Proctor told the Nardellis MetLife would pay supplements after the check, Ken Nardelli, as discussed, testified to the contrary. He testified MetLife manager Maurer told him "[MetLife's] obligations were met and they were finished with it."

¶ 39 Third, MetLife employees admitted they knew that if the Nardellis accepted the check and decided not to repair they would never receive the full repair costs. Further, Woolley admitted she never called Proctor and asked him about the possible range of supplements before sending the check to the Nardellis.

¶ 40 Finally, MetLife submitted the check with joint payees—the Nardellis and the Nardellis' lender—anticipating the lender would force the Nardellis to authorize repairs. We acknowledge that if MetLife chose the repair option, the Nardellis' policy required it to issue the check to both the Nardellis and their lender. As the Nardellis argue, however, given MetLife's employees' testimony, the jury could have reasonably concluded MetLife issued this check "[k]nowing that [the Nardellis] disagreed with the decision to repair" and to "force[ ] that decision." At trial, Woolley acknowledged MetLife knew, on October 29, 2002, the Nardellis did not want to authorize repairs, and other MetLife employees acknowledged they anticipated the lender would want the Explorer repaired. On direct examination, claims manager Oyler testified that when he spoke to Ken Nardelli on October 29, 2002, "Mr. Nardelli made it clear he didn't want the vehicle," and added, "I knew he had a lienholder .... the lienholder is probably going to make him repair the vehicle." [9]

¶ 41 Thus, the Nardellis presented substantial evidence from which a reasonable jury could have found it was objectively unreasonable to send the Nardellis a check that did not cover all repair costs and MetLife subjectively knew it was unreasonable yet did so to force the Nardellis to authorize repairs and abandon their claim the Explorer should be declared a total loss.

*iii.  Failure to Advise of Policy Provisions*

¶ 42 The Nardellis also presented evidence MetLife failed to advise them of two policy provisions that could have provided them with additional benefits.

¶ 43 The first provision, an endorsement known as the "V550," generally provided additional benefits to the Nardellis if they had experienced a total loss.[10] The V550 applied if, in the event of a total loss, the Explorer was less than one year old and had fewer than 15,000 miles as of the date of the theft.

¶ 44 On September 4, 2002, when MetLife sent its initial letter to the Nardellis explaining coverages before the Explorer turned up in Mexico, no one at MetLife had any reason to believe the V550 was inapplicable. The Explorer would have been a total loss, it was less than one year old, and when he first reported the claim Ken Nardelli advised MetLife claims adjuster Simpson he estimated the Explorer had 13,600 miles.

¶ 45 MetLife knew the Nardellis' policy included the V550, and although Woolley insisted she and Simpson had explained it to the Nardellis, MetLife's claim file failed to reflect this. MetLife's letters to the Nardellis also failed to mention the V550.

¶ 46 Thus, a reasonable jury could find MetLife had not taken any steps to advise the Nardellis about the V550, even though, based on the information MetLife had re-

9.  On cross-examination, Oyler softened this testimony and disagreed MetLife was trying to force the Nardellis' hand, testifying, "I don't think I said that they would have no choice to repair. I anticipated that they probably would have repaired the vehicle." It was up to the jury to assess his testimony.

10.  Although the parties presented confusing and conflicting explanations of the exact nature of the benefits this endorsement added, suffice it to say, according to the Nardellis' insurance expert, under the V550 MetLife was required to replace the Explorer with a similar brand-new vehicle or, if possible, repair to brand-new condition. A MetLife employee testified the added benefit was that MetLife would replace with a new vehicle or repair under the terms of the basic policy, but without taking depreciation into account as the basic policy would. Under either scenario the benefits were greater than those in the basic policy.

ceived from the Nardellis, the V550 was in play.

¶ 47 On appeal, MetLife argues, as it did in the superior court, the V550 was irrelevant because the Explorer did not meet the 15,-000–miles requirement. On September 27, 2002, after the Explorer had been discovered in Mexico and after MetLife had communicated with the Nardellis numerous times without discussing the V550, Ken Nardelli asked Simpson if MetLife would reimburse him for the mileage the thieves had placed on the Explorer. Not until after MetLife rejected the Nardellis' request to total and insisted the Explorer was repairable did MetLife—in the same October 31, 2002 letter in which it stood on its repair decision—request mileage documentation for the purpose of paying the excess mileage. In response, in November, Ken Nardelli sent MetLife an oil-change receipt from over 50 days before the theft.[11] MetLife used the receipt to estimate the Explorer would have had 16,070 miles at the time it was stolen and paid the Nardellis $648.08 for the excess mileage.

¶ 48 Ken Nardelli testified that although he read the policy, he "didn't know what a V550 [was]" and only understood its meaning after he had sued MetLife.[12] He also testified that if he had understood how the Ex-

plorer's mileage might affect the applicability of the V550 and his benefits under the policy, he "would have made a strong effort to try to figure out the exact mileage."

¶ 49 MetLife's after-the-fact use of the oil-change information to assert the V550 was irrelevant came only after it had repeatedly failed to advise the Nardellis of the provision. Had MetLife explained the V550 while explaining other coverages, it would have given the Nardellis a meaningful opportunity to marshal their best evidence of mileage and show the Explorer met the V550's requirements.[13]

¶ 50 The second provision MetLife failed to advise the Nardellis of was an appraisal provision. Under the provision, each party could trigger an appraisal process to determine the amount of loss.[14]

¶ 51 As explained, MetLife insisted the Explorer's damage was less than its actual cash value. The Nardellis vigorously disagreed; in their opinion, the Explorer had been trashed and should have been totaled.[15] Under MetLife's formulaic approach, see supra ¶ 27, repair costs—the amount of the loss—drove the determination of whether the Explorer should have been totaled.[16] Thus, the parties disagreed regarding the amount of the loss, and this disagreement implicated the appraisal provision.[17] Cf. Home Indem.

---

11. This receipt showed the Explorer had 13,300 miles as of the date of the oil change—July 13, 2002.

12. We also note MetLife argues it had no duty to explain the V550 because it was "unambiguous," yet one MetLife claims manager explicitly disagreed with another MetLife employee's interpretation of the provision, and after Oyler, an experienced claims manager, testified to its meaning at least four separate times throughout one day of trial, a juror asked, "why does it exist, this endorsement?"

13. This is especially so given MetLife's estimate showed the Explorer was within 1,100 miles of meeting the requirements.

14. The provision provided, in part:
If within 60 days after proof of loss is filed, there is a disagreement as to the amount, you or we may demand an appraisal. Each party will select a competent appraiser. Each appraiser will state separately the actual cash value and the amount of loss. If they fail to agree, they must select and submit their differ-

ences to a competent and disinterested umpire. Agreement by any two will determine the amount of loss.
(Emphasis omitted.)

15. As Mike testified, "I don't recall [Ken Nardelli] ever coming out and saying it was the insurance process that really bothered him. It was the damage to the [Explorer] and it not getting put back to pre-loss condition that he was really concerned about."

16. Under the basic policy, loss is defined as "direct and accidental loss or damage." As described in paragraph 27 supra, MetLife defined total loss as "a loss in which the cost to replace or repair the vehicle to its pre-loss condition plus the salvage value, equals or exceeds the actual cash value."

17. As one of the Nardellis' insurance experts explained, appraisal was implicated because MetLife "has an estimate for 11 thousand some dollars. Mr. Nardelli says, 'No. It's a total loss.' There is a disagreement as to amount. That's pretty simple to me."

*Co. v. Bush,* 20 Ariz.App. 355, 358–59, 513 P.2d 145, 148–49 (1973) (insured may waive his or her right to appraisal when "there [is] no legitimate dispute as to amount of loss" and insurer begins repairs).

¶ 52 Further, MetLife manager Woolley acknowledged that when she spoke to Ken Nardelli on October 29, 2002, "he made it quite clear ... he wasn't going to authorize the repairs." Thus, internally, MetLife employees discussed using the appraisal provision for MetLife's benefit and noted, in an internal email, they hoped to "amicably conclude this matter short of invoking the appraisal clause."

¶ 53 Despite the foregoing, MetLife argues it had "no duty to point out the two policy provisions [to the Nardellis] in the first place," citing *Chase v. Blue Cross of Cal.,* 42 Cal.App.4th 1142, 50 Cal.Rptr.2d 178, 186–87 (1996) (insured could not avoid arbitration when policy, brochures, and multiple letters contained clear arbitration clause); *Mt. Hawley Ins. Co. v. Fed. Sav. & Loan Ins. Co.,* 695 F.Supp. 469, 480–81 (C.D.Cal.1987) (sophisticated party could not later use clear, unambiguous discovery clause—which would have permitted it to extend policy past expiration—by claiming it was unaware of the clause). In each of these cases, the court held the insured was bound by clear policy provisions. Accordingly, these cases are distinguishable, and MetLife's reliance on them is misplaced.[18]

¶ 54 While we acknowledge an insurer is not required to explain every fact and provision without limitation, *see Twaite v. Allstate Ins. Co.,* 216 Cal.App.3d 239, 264 Cal.Rptr. 598 (1989) (insurer did not breach duty of good faith and fair dealing when it offered to buy insured a new vehicle, insured refused and accepted payment for actual cash value without raising any dispute, then later argued insurer should have advised him of right to appraisal), the duty of good faith

encompasses some obligation to inform the insured about the extent of coverage and his or her rights under the policy and to do so in a way that is not misleading. *See Rawlings v. Apodaca,* 151 Ariz. 149, 156–57, 726 P.2d 565, 572–73 (1986) (quoting *Tank v. State Farm Fire & Cas. Co.,* 105 Wash.2d 381, 715 P.2d 1133 (1986)) ("insurer must deal *fairly* with an insured, giving equal consideration *in all matters* to the insured's interests"); *see also Sarchett,* 233 Cal.Rptr. 76, 729 P.2d at 275–77 (internal quotation omitted) ("important facet" of duty of equal consideration is "the duty reasonably to inform an insured of the insured's rights and obligations under the insurance policy"); *State Farm Mut. Auto. Ins. Co. v. Shuman,* 175 Ind.App. 186, 370 N.E.2d 941 (1977) (sustaining punitive damages when insurer attempted to induce estate of insured decedent to settle claim without disclosing or explaining all benefits and estate representative "lacked the education and experience to understand the policy terms on her own").

¶ 55 We also note the Arizona Administrative Code requires

[n]o insurer shall fail to fully disclose to first party claimants all pertinent benefits, coverages or other provisions of an insurance policy or insurance contract under which a claim is presented [and,]

[n]o agent shall conceal from first party claimants benefits, coverages or other provisions of any insurance policy or insurance contract when such benefits, coverages or other provisions are pertinent to a claim.

Ariz. Admin. Code R20–6–801(D)(1)–(2).

¶ 56 At trial, Woolley acknowledged, "we all know that people don't look that closely at their policies," and Woolley and Oyler both admitted MetLife should have alerted the Nardellis to both provisions if they applied. Indeed, MetLife's own 2001–2002 "Good Faith Training Scripts" taught, under a sec-

---

18. *Cf. Sarchett v. Blue Shield of Cal.,* 43 Cal.3d 1, 233 Cal.Rptr. 76, 729 P.2d 267, 276–77 (1987) (affirming directed verdict on bad faith when insurer failed to apprise insured of arbitration provision; court must hold insured to clear and conspicuous policy provisions even if evidence suggests insured did not read or understand them, but, "[o]nce it becomes clear to the insurer

that its insured disputes its denial of coverage ... the duty of good faith does not permit the insurer passively to assume that its insured is aware of his rights under the policy. The insurer must instead take affirmative steps to make sure that the insured is informed of his remedial rights").

tion titled "BASICS OF CLAIM HANDLING," that claims handlers should "[t]imely ... [a]dvise insured of contract right e.g. *Appraisal*."

¶ 57 Thus, MetLife's argument it had no duty at all to advise the Nardellis of these two policy provisions is undercut by its own employees' testimony at trial and its internal training manuals. Under these circumstances—in which MetLife internally acknowledged the significance of these two provisions to the Nardellis' claim and repeatedly discussed coverages with the Nardellis without even mentioning them—there is substantial evidence from which a reasonable jury could have found MetLife acted objectively unreasonably in failing to raise the two provisions with the Nardellis. Further, the Nardellis presented substantial evidence, including MetLife's employees' admissions and its internal guidelines, that MetLife subjectively knew it was unreasonable to fail to advise the Nardellis of the provisions.

¶ 58 Therefore, because substantial evidence permitted the jury to find MetLife breached the implied covenant of good faith and fair dealing, we affirm the superior court's denial of MetLife's motion for judgment as a matter of law on bad-faith liability.

### C. Punitive Damages—Entitlement

¶ 59 As discussed, the superior court denied MetLife's motions for judgment as a matter of law on punitive damages, thus finding the Nardellis presented clear and convincing evidence they were entitled to punitive damages. On appeal, MetLife attacks the superior court's rulings on these motions and asserts clear and convincing evidence did not support the jury's finding the Nardellis were entitled to punitive damages. Again, we disagree with MetLife.

¶ 60 To recover punitive damages, the plaintiff must "show 'something more' than the conduct necessary to establish the tort" of bad faith. *Thompson v. Better–Bilt Aluminum Prods. Co.*, 171 Ariz. 550, 556, 832 P.2d 203, 209 (1992) (quoting *Rawlings*, 151 Ariz. at 161, 726 P.2d at 577). Our courts have developed a shorthand reference for this "something more," requiring the plaintiff

to "prove that defendant's evil hand was guided by an evil mind." *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578. The requisite "evil mind" may be "manifested in either of two ways. It may be found where defendant intended to injure the plaintiff. It may also be found where, although not intending to cause injury, defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Id.* As our supreme court has instructed, punitive damages are recoverable in a bad faith tort action

> when, *and only when*, the facts establish that defendant's conduct was aggravated, outrageous, malicious or fraudulent. Indifference to facts or failure to investigate are sufficient to establish the tort of bad faith but may not rise to the level required by the punitive damage rule.... When defendant's motives are shown to be so improper, *or* its conduct so oppressive, outrageous or intolerable that such an "evil mind" may be inferred, punitive damages may be awarded.

*Id.* at 578–79, 726 P.2d at 162–63 (internal citations omitted). Further, the plaintiff must prove the defendant's evil mind by clear and convincing evidence. *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 332, 723 P.2d 675, 681 (1986).

¶ 61 A plaintiff may "meet the clear and convincing standard by either direct or circumstantial evidence," *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn*, 184 Ariz. 120, 132, 907 P.2d 506, 518 (App.1995), and we may infer an "evil mind" from a defendant's conduct or objectives. *Hudgins v. Southwest Airlines, Co.*, 221 Ariz. 472, 487, ¶ 40, 212 P.3d 810, 825 (App.2009). As our supreme court has noted, however, "unless the defendant is willing to take the stand and admit its 'evil mind,' the plaintiff must prove entitlement to punitive damages with circumstantial evidence." *Hawkins v. Allstate Ins. Co.*, 152 Ariz. 490, 498, 733 P.2d 1073, 1081 (1987).

¶ 62 On this record, applying the de novo standard of review and viewing "the evidence and all reasonable inferences from the evidence in the light most favorable to [the Nardellis] as the nonmoving parties," *see*

*Hudgins,* 221 Ariz. at 486, ¶ 37, 212 P.3d at 824, we hold the Nardellis presented clear and convincing evidence entitling them to an award of punitive damages under the foregoing principles.[19] Specifically, as we discuss below, the Nardellis presented evidence MetLife had, first, by November 2001, instituted an aggressive company-wide profit goal for 2002 (the year of the Nardellis' claim); second, assigned to the claims department a significant role in achieving that goal; third, aggressively communicated this goal to the claims department (including the office and employees handling the Nardellis' claim); fourth, tied the benefits of claims offices and individuals to, among other things, the average amount paid on claims; and fifth, implemented these actions without taking steps to ensure its efforts to drive up its corporate profits would not affect whether it treated its insureds fairly. *Rawlings,* 151 Ariz. at 154–57, 726 P.2d at 570–73. As we also discuss, from this evidence the jury could reasonably find the decisions MetLife made in adjusting the Nardellis' claim, *see supra* ¶¶ 21–57, were driven by financial self interest and not by the merits of the Nardellis' claim or the terms of their MetLife policy, and therefore, MetLife acted outrageously and with the requisite evil mind.

¶ 63 The year before the Nardellis' claim, MetLife's auto and home division (which included the claims department) was "underperforming," had only earned $52 million "after[ ]tax on revenue of $2.8 billion," and was "incurring [$106] ... in losses and expenses ... on every hundred [it] took in." The auto and home division's financial position was a significant issue for MetLife, which had become a publicly-traded company the year before, and its chairman was "coming down hard on the ... division." Thus, MetLife adopted a goal of making at least $155 million profit in 2002, and presented this plan to investors. Although at trial MetLife employees testified the claims department was not assigned a specific numerical goal, they acknowledged the department was "expected to contribute" to meeting the $155 million target.

¶ 64 Indeed, in presentations to all employees, *see infra* ¶¶ 66–67, MetLife's president and other officers explained MetLife was "looking to the claims department to absorb all of the normal inflation" so savings from other departments, such as pricing and underwriting, could "drop ... right to the bottom line." If the division did not meet these goals and "earnings [did not] hit $155 million fairly soon, the [auto and home] division [would] probably be put up for sale." As MetLife's president wrote to all MetLife managers in 2001, "reaching our goal of $155 million in earnings in 2002 is not optional—it is a business promise ... and it must be met with resolve .... Everything counts and everyone counts."

¶ 65 The employees in MetLife's claims offices clearly understood the urgency of meeting the $155 million goal and the consequences of failing to do so. During the "Roadshow presentations," *see infra* ¶¶ 66–67, claims employees submitted questions including, "[w]ho gets the axe if we don't make 155 million?" and the St. Louis claims office that handled the Nardellis' claim asked, "[w]hat are the consequences if we are unable to make the $155 million in 2002? ... What is the future outlook for [this office]? Do you anticipate layoffs?" MetLife's answer, given in its "Documentation of Q & A And Feedback," was, "[i]t depends on the story behind why we didn't achieve it. If we can't prove we are profitable, MetLife doesn't need us."

¶ 66 To achieve the $155 million target, MetLife senior management implemented a series of "Roadshow" presentations on the company's goals and strategies[20] and re-

---

19. We note the superior court instructed the jury it could award punitive damages if it found the Nardellis had proved "by clear and convincing evidence, either direct or circumstantial, that [MetLife] acted with an evil mind" evidenced by "[i]ntent to cause injury or wrongful conduct motivated by spite or ill will where [MetLife] consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." Although this instruction—to which MetLife did not object—may have been incomplete, *see supra* ¶ 60, we review the record under the principles discussed above.

20. In one Roadshow, a corporate officer noted the profit goal was "a number that's tattooed on everyone's upper lip and inner eyelids, so every time we blink we see that 155 flashing." Fur-

quired managers to communicate these messages to "every associate throughout the company," including the St. Louis field claims office which handled the Nardellis' claim. Indeed, during the claims segment of the presentation, the St. Louis office was present via live audio-conference.

¶ 67 In the Roadshow presentations, senior officers of the division, including those in the claims department, informed every employee that MetLife had adopted a policy to "be tougher on claims" in which "every dollar counts, and we'll do it one claim at a time." Further, although during the presentations senior management officers relied on different measures of the impact the claims department could have on meeting the goal, as MetLife's chief financial officer ("CFO") clarified at trial, "after tax ... one point up in severity [21] is going to be 14 [million dollars] the wrong way, one point down is going to be 14 [million dollars] the right way." Indeed, one claims officer, discussing a computer "liability assessment tool" called Pinnacle, told everyone during the claims Roadshow that MetLife "always track[s] what we pay at 100% .... For years we paid 90 and 91% .... In October [2001] I saw ... the most recent Pinnacle results, we were at about 87% of paying claims at 100%. Each point's worth $700,000 to the bottom line. *It's money on the floor.*" (Emphasis added.)

¶ 68 Through these presentations, MetLife communicated a corporate policy to "every associate" that emphasized they should keep the $155 million target in mind when evaluating every aspect of every claim. As a senior claims officer put it during a Roadshow question-and-answer session, "the point ... is that everything that has an impact, we are going after." [22]

¶ 69 Further, to achieve this goal, MetLife not only emphasized to the claims department employees that severities would "impact" the bottom line, it also tied each claims office's compensation to severities, with resulting effect on individual compensation. MetLife, through performance reviews upon which bonuses were based, imposed severity goals on the St. Louis office and managers who handled the Nardellis' claim and decided to repair and not total the Explorer, sent the Nardellis a check for less than the repair costs, and said nothing to them about the policy provisions that could provide additional benefits. *See Niver v. Travelers Indem. Co. of Ill.,* 433 F.Supp.2d 968, 981 (N.D.Iowa 2006) (evidence "suggesting *why* [insurer's] adjustors may have handled [insured's] claim in a certain way, particularly where that evidence suggests that the adjustors may have received compensation or incentives for minimizing payouts on claims, is relevant, at a minimum, to the issue of whether [insurer] acted in willful and wanton disregard of [insured's] right to fair compensation" for purposes of punitive damages). Specifically, the profit goal was "common knowledge" in the office, and the office received a particular share of bonus money dependent, in part, on its performance with regard to severities. [23]

ther, at the beginning of the Roadshow on claims, MetLife's president discussed her meeting with MetLife's investors and board of directors in which one officer noted a risk of MetLife's plan was " 'execution risk,' meaning that [MetLife] had to do things right, everything counts." She then commented that at dinner after the investor presentations, "everybody kept saying to me, 'and if you don't make your hundred million improvement in earnings, how will you be executed?' " Although these comments were somewhat facetious, they opened and set the tone for the Roadshows and, as the Nardellis' insurance expert testified, they were "consistent with the tone ... overall about this goal.... Urgency, bad things will happen if we don't reach the goal, we've got to do it. Everything, every way possible."

21. MetLife internally defined severities as "the average claim payment."

22. As the Nardellis' insurance expert summarized, MetLife communicated to claims employees that "everybody at every level in the company is going to be ... expected to help meet this [profit] goal or bad things might happen."

23. Although MetLife employees insisted these goals did not influence them to underpay claims, this inference was the jury's to make. *See Thompson,* 171 Ariz. at 557–58, 832 P.2d at 210–11. As Oyler testified,

We tell [the employees we supervise] about the office goal but we don't give our supervisors or our field appraiser a specific severity goal. It is an office goal but they would be held—if we didn't—you know, if we didn't reach our goal and we didn't maintain that goal it could affect them.

¶ 70 As MetLife officers explained during the Roadshow presentations, MetLife used "claims balance scorecard[s]" to measure claims office performance and "focus to make sure they [were] on target to hit the 155." One claims officer agreed at trial the measures listed on the scorecard reflected the "behavior [MetLife wanted] to encourage." The category which received the most weight on these scorecards was titled "core competencies: severities." [24]

¶ 71 As a MetLife's claims vice president explained, these scorecards were "used ... in incentive compensation determination." [25] One-third of the portion of the incentive pay each claims office received was "at risk, subject to the claims balance scorecard." Thus, in 2002, this put approximately $60,000 of the St. Louis office's incentive pay "at risk" subject to its performance on criteria which included its average claims payments. Of its 2002 "at risk" amount, the St. Louis office was rewarded approximately $47,500. "[A]t that point ... the claims management within the office, distribute[d] the money ... based upon the performance of each of the individuals." [26]

¶ 72 The Nardellis also presented other evidence MetLife's efforts to reach its profit goal influenced how its employees handled claims. As a senior claims officer told all employees during a Roadshow presentation, the "claim offices ... [were] getting psyched by what they [were] hearing and they [were] raring to hit those files and do the work they need[ed] to do to get to 155 [million dollars]."

Although Woolley—one of the managers who took part in the final decisions described in section I B, *supra*—stated she did not feel "any pressure" to reach the $155 million goal, she also testified she had read MetLife's president's message that the goal was "not optional" and knew "it was important for us to meet that goal." In 2000, Woolley only "met some expectations" regarding controlling severities, meaning her performance "sometimes met and sometimes fell short of expectations" in that category. [27] Her 2002 employee review, however, revealed she "met expectations"—meaning she "consistently met and sometimes exceeded expectations"—in the "core competency" of "maintain[ing] proper control of severities in all lines" of coverage, and her reviewer noted, "[s]everities have generally been positive [year to date], particularly in auto physical damage."

¶ 73 The performance reviews of Oyler—Woolley's supervisor—reflected the same change: in 2001, he "sometimes met and sometimes fell short of expectations" in maintaining severities, and in 2002, he "consistently met and sometimes exceeded expectations" in the same category. His reviewer wrote, "auto physical damage severities are trending very well through early December.... Expenses are a 'mixed bag.'" Even if the jury accepted that these results reflected improvements in other lines of business, such as homeowner's coverage, it could nevertheless reasonably conclude these results demonstrated the claims handlers were affected by MetLife's instructions to its employees to control severities. [28]

24. While some of the subcategories under "core competencies" included subrogation and salvage, they also included "Gross Paid" on items such as "bodily injury," "collision," and "comprehensive." Further, although MetLife employees testified underpaying claims would negatively affect other measures on the scorecard, such as customer satisfaction and the "closed file" ratio, given the evidence presented, again, it was up to the jury to decide the effect of these incentives.

25. For example, MetLife's internal 2002 "Incentive Compensation Distribution" memo noted, "additional incentive money [would be] available to those employees and offices that ... made the greatest contribution to the 2001 results of both the Claim Department and the Company." Among other things, claims offices were ranked by their severity results in each line of coverage.

26. In addition to using the claims balance scorecards for bonuses, Oyler explained the scorecards also "play[ed]" a part in whether a claims person [would] receive a raise."

27. Although Woolley insisted the severities category on her scorecard was "about the office, not me personally. I am not personally held accountable for severities," a MetLife claims vice president testified claims decision makers, like Woolley and Oyler, "do have severity goals," and, about the scorecard, explained, "no one individual *aside from the manager* is responsible for all those areas." (Emphasis added.)

28. In fact, in applying for a promotion in 2004, Woolley listed as a "Major Accomplishment," that she had "[l]ed Property Department for [the] past two years to strong production and severity results."

¶ 74 Finally, the Nardellis presented evidence MetLife did nothing to ensure its laser-like focus on meeting the $155 million goal did not affect how its employees handled, evaluated, and assessed claims. Regarding the specific goal—described in the Roadshow presentations—of claims absorbing inflation, the Nardellis' insurance expert testified, "you don't want claims people involved in anything that looks like that . . . you can train claims people to do a better job, but you cannot get this message in front of their eyes in any way, shape or form." At trial, MetLife's CFO agreed that "looking at claims to absorb . . . projected inflation . . . . would be inappropriate." [29] Indeed, MetLife's own insurance expert acknowledged "if there's a goal with the purpose to motivate claims handlers to pay less than [projected], it would be inappropriate."

¶ 75 The Nardellis' insurance expert further testified, for example, that while insurance companies could permissibly give profit goals to other departments, it would "absolutely not" be appropriate "for an insurance company to try to improve its bottom line by adopting a policy of getting tough on claims." Nevertheless, at trial, one claims officer who participated in the Roadshow presentations agreed that, to his knowledge, "[n]o one in the [Roadshow] presentations . . . in talking about claims, discussed how important it was to make sure that claims people shouldn't get caught up in this $155 million goal achievement when they were paying claims." [30]

¶ 76 The Nardellis' expert also testified insurance companies must "affirmatively remind the claims people that, '[profitability is] not your problem. Your job is to get the claim, investigate it properly, respond to the phone calls, be fair, act in good faith,'" and it should "train against" claims employees thinking "their bonus at the end of the year might get affected if the company is not profitable." He added it was "absolutely"

inappropriate to tie incentive compensation to the amounts paid on claims and, although there is "[n]o problem with the [other] categories [on the claims balance scorecards] . . . when you add severity goals or objectives or reward people based on meeting severity targets or goals, bad things happen." Indeed, as Oyler acknowledged, "if you have a goal to reduce severities by X percentage or X number of points . . . [it] then becomes your orientation to try to achieve that."

¶ 77 At trial, MetLife's CFO and its insurance expert both agreed, "each claims decision must be based on the merits of the claim without any influence of monetary incentive." Yet, given the evidence described above, the jury could have reasonably concluded MetLife's directive to work toward the $155 million goal "one claim at a time," combined with its bonus compensation measures, contravened these principles. As the Nardellis' insurance expert summarized, MetLife's "claims decisions in 2002 [were] at significant risk of being influenced by the corporate goal of achieving $155 million in profit." [31]

¶ 78 Despite the foregoing, MetLife argues "[t]here is no evidence that [it] ever endorsed *illegitimate* means of reducing severities." We agree no witness ever admitted MetLife did what the Nardellis accused it of doing—chiseling away at what MetLife owed to them under the policy in order to meet its $155 million profit goal. We also acknowledge MetLife presented testimony it intended the claims department to save money through measures such as fighting fraud, providing good service, and controlling expenses. MetLife employees also testified they did not "contemplate that the claim[s] department would underpay any claim" and did not underpay the Nardellis' claim. We also agree with MetLife and our dissenting colleague that wanting to make a profit is not, by itself, evidence of bad faith or an evil mind.

29. Although he also implied the discussion of claims absorbing inflation might have been in the context of "fighting fraud," the Roadshow videos do not reflect this.

30. Indeed, although during one Roadshow question-and-answer session this officer stated he would create and distribute a list of all of the claims department's specific initiatives for reach-

ing the profit goal, he testified at trial "[t]here wasn't a 14–initiative document" and he was simply referring to sample initiatives mentioned during the Roadshow presentations.

31. In 2002, "the company met its goal of 155 million, in fact exceeded it." As one MetLife presentation showed, "2002 Earnings Promised: $155 Million; Delivered: $162 Million!"

¶ 79 But, we are not faced with a record that shows MetLife's "quest for profits" was, as our dissenting colleague suggests, nothing out of the ordinary and, as MetLife argues, had no bearing on how it actually adjusted the Nardellis' claim. The Nardellis marshaled evidence that painted a very different picture—evidence from which a reasonable jury could conclude MetLife impressed upon its claims employees, including the employees handling the Nardellis' claim, that they were to decide every aspect of every claim based on making $155 million in profits.

¶ 80 The Nardellis presented evidence MetLife's auto and home division was in a make or break situation. The division would likely be sold if it failed to make the $155 million target. The pressure to meet the $155 million mark was palpable and the employees in MetLife claims offices, including the office handling the Nardellis' claim, fully understood the likely results (i.e., getting "the axe"; layoffs) if the claims department failed to do what was expected of it—"to absorb all the normal inflation." The situation that faced MetLife thus went far beyond "ordinary business pressures" as the dissent suggests. From the evidence, the jury could reasonably have found MetLife's directive that "every dollar" counted "one claim at a time" caused the employees handling the Nardellis' claim to decide not to total the Explorer, not to issue a check that represented repair costs, and not to tell the Nardellis about policy provisions that could have provided additional benefits.

¶ 81 Based on our review of the record, we agree with the superior court's characterization of the evidence regarding MetLife's conduct:

> [w]hile it is permissible for a company to implement an aggressive plan to increase profits, it is also responsible for the foreseeable risks in carrying out such a plan. Indeed, [MetLife] produced little evidence that it made reasonable mitigation efforts to prevent the type of conduct that occurred in this case.

Sufficient evidence supports the conclusion MetLife acted with "conscious disregard of [the Nardellis'] rights and the injury that might result." [32] *Thompson*, 171 Ariz. at 557, 832 P.2d at 210. We therefore affirm the superior court's denial of MetLife's motion for judgment as a matter of law on the Nardellis' entitlement to punitive damages.

## II. The Constitutionality of the Punitive Damages Award

¶ 82 The Nardellis argue we should vacate the superior court's reduction of the punitive damages award and reinstate an award of at least $10 million, while MetLife argues, under constitutional principles of due process, the punitive damages should be at a ratio of no more than 1:1 to the compensatory damages. As we explain, we agree with MetLife.

¶ 83 "The Due Process Clause of the United States Constitution 'imposes a substantive limit on the size of punitive damages awards'" and we are obligated to review de novo the amount of the punitive damages awarded here. *Pope*, 219 Ariz. at 501, ¶¶ 93–94, 200 P.3d at 998. We acknowledge "[t]he role of gatekeeper over ... punitive damages verdicts is one of the most challenging that has been placed upon appellate judges in civil cases." *Id.* at 504, ¶ 107, 200 P.3d at 1001 (internal quotation omitted).

¶ 84 Thus, we exercise "exacting" discretion and apply our "combined experience and judgment" to our careful de novo review of constitutional principles and the record, and are convinced a 1:1 ratio is appropriate. *Id.* at ¶ 108 (internal quotation omitted). In making this determination, we review the evidence using the three guideposts identified by the United States Supreme Court: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Id.* (quoting

---

32. The Nardellis presented additional evidence that would further support the conclusion MetLife acted in conscious disregard of a substantial risk of harm to the Nardellis' rights, *see infra* ¶¶ 91–93.

State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 1520, 155 L.Ed.2d 585 (2003)).

### A. Reprehensibility

¶ 85 To analyze reprehensibility, we consider whether:

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

Id. at 501, ¶ 95, 200 P.3d at 998 (quoting Campbell, 538 U.S. at 419, 123 S.Ct. at 1521).

¶ 86 Here, although the harm to the Nardellis resulting from MetLife's decision to repair was significant, it was largely economic. The Nardellis presented evidence Met-Life's handling of the claim aggravated Ken Nardelli's pre-existing mental health conditions, but did not present any evidence Met-Life knew of these conditions or acted knowing it would aggravate them.

¶ 87 Further, although the Nardellis testified they worried the Explorer would be unsafe and presented evidence it later had some alignment problems,[33] Mike testified that at the time he was working with the Nardellis and MetLife, he was confident Earnhardt would repair the Explorer to a safe condition. Proctor also testified he and Mike "both assured [Ken Nardelli] ... Earn-hardt Ford ... would never put a vehicle back on the road that wasn't safe after repairs."

¶ 88 The evidence did not demonstrate the Nardellis were financially vulnerable. We recognize the Nardellis felt pressured to accept MetLife's check for repairs and to allow the bank to repossess the Explorer, and this damaged their credit. Ken Nardelli also testified, however, they had ample credit for the family's needs and were quickly able to buy another new vehicle.

¶ 89 Here, we cannot say MetLife's conduct was an "isolated incident," but we can say the Nardellis did not present evidence MetLife's actions were part of a pattern of longstanding duration. The Nardellis showed saving money was an initiative Met-Life sought to instill in every employee's mind regarding every decision, see supra ¶¶ 64–73. Nevertheless, unlike the insurer in Hawkins, see infra ¶ 98, MetLife did not engage in a longstanding premeditated pattern of "established company policy" in which it explicitly instructed its employees to automatically make predetermined arbitrary deductions and adjustments in valuing property losses. 152 Ariz. at 495, 502, 733 P.2d at 1078, 1085.

¶ 90 Finally, the Nardellis presented evidence that the way MetLife resolved their claim under the policy was not the result of "mere accident" and involved what could be characterized as "affirmative acts"—see prior discussion regarding appraisal and endorsement provisions at section I A iii supra—coupled with, as the superior court put it, its "desire to put profits over the fiduciary duty they owed their insured," see supra section I C.

¶ 91 For example, MetLife repeatedly distanced itself from its own internal guidelines on claims handling. First, as described above, see supra ¶ 56, MetLife's "Good Faith Training Scripts" instructed that claims handlers should advise the insured of contract rights, including appraisal, yet MetLife employees insisted it was appropriate to consider appraisal internally without explaining the right to the Nardellis.

¶ 92 Second, MetLife's "National Total Loss & Salvage Guidelines," see supra ¶ 33, included a points system which indicated that, above a certain number of points, "you have a probable total loss," and as the Nardellis' insurance expert explained, the damage to the Explorer could have exceeded the points threshold. MetLife employees insisted these guidelines were irrelevant because MetLife only used the worksheet for initial

---

33. The Explorer's current owner, who testified the Explorer wore out tires quickly, stated it is "pretty safe, but ... I have to [change the tires frequently] to keep it safe because I [have] got my grandson in there and my son."

call centers. The Nardellis presented expert testimony, however, "this is a continuing process . . . . [y]ou would certainly want a field adjustor to . . . be cognizant of that checklist and . . . [MetLife's] internal guidance."

¶ 93 In a final example, MetLife's internal "Complaint Handling Procedure" stated, "[i]f the complaint is about an Agent, Service or Claims Representative—do not let that person respond to the complaint. Responses should always be made by management. This avoids the possibility of a self-serving response letter." Yet, the Nardellis presented evidence that when Ken Nardelli spoke to supervisor Maurer on October 30, 2002, and indicated he would complain to MetLife's president, Maurer said, "go ahead, they'll just give it back to me and you still will not get what you want." Indeed, a MetLife attorney reviewed the complaint with Maurer, and Maurer called the Nardellis, but never sent any formal response letter. MetLife employees attempted to explain this by noting the guidelines require "responses should always be made by management, and [Maurer was] . . . management."

¶ 94 Thus, considering all the evidence and looking at all the pertinent factors, we find MetLife's misconduct falls within the low to, at most, the middle range of the reprehensibility scale as described in *Hudgins,* 221 Ariz. at 490, ¶¶ 52–55, 212 P.3d at 828.

### B. Ratio of Compensatory Damages to Punitive Damages

¶ 95 We do not impose a bright-line ratio between compensatory and punitive damages, but note "an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety . . . . [and] '[w]hen compensatory damages are substantial, . . . a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.'" *Pope,* 219 Ariz. at 503, ¶ 103, 200 P.3d at 1000 (quoting *Campbell,* 538 U.S. at 425, 123 S.Ct. at 1524).

¶ 96 MetLife's actions interfered with certain of the Nardellis' rights under the policy and caused other harm, including credit damage and emotional harm, but the jury's $155,000 compensatory damage award was

substantial. Further, although we recognize the appropriate amount of punitive damages is fact-sensitive, after a close reading of other cases in which Arizona courts have examined the appropriate ratios between compensatory and punitive damages, given our reprehensibility review and the substantial compensatory damages here, the evidence does not support the roughly 355:1 ratio the jury imposed, nor the 4:1 ratio the superior court imposed. *See Hudgins,* 221 Ariz. at 490–91, ¶¶ 56–59, 212 P.3d at 828–29; *Pope,* 219 Ariz. at 503–04, ¶¶ 103–06, 200 P.3d at 1000–01.

### C. Comparative Penalties

¶ 97 As MetLife points out, the legislature has capped civil penalties for unfair claims settlement practices at $50,000 per six-month period. Ariz.Rev.Stat. §§ 20–461(A), –456(B) (2004); *see also BMW of North Am., Inc. v. Gore,* 517 U.S. 559, 583–84, 116 S.Ct. 1589, 1603, 134 L.Ed.2d 809 (1996) (comparing punitive damages to state unfair trade practices penalties). These civil penalties alone would not have given MetLife notice its practices could result in a $55 million punitive award.

¶ 98 Further, although Arizona courts have affirmed substantial punitive damage awards, *see Hawkins,* 152 Ariz. 490, 733 P.2d 1073 (reinstating jury's $3.5 million punitive damage award), our task under the Constitution is to review the evidence in each case. The level of reprehensibility in *Hawkins* was, as discussed, far different from the reprehensibility in this case. *See id.* at 493–95, 502, 733 P.2d at 1076–78, 1085 ("Allstate engaged in deceptive claims practices spanning up to 18 years," estimates did not reflect the options on insured vehicle, jury only awarded $15,000 in compensatory damages, claims representatives "instructed . . . to automatically make certain deductions in determining [vehicle's] actual cash value"; "jury could have rationally concluded . . . conduct was highly reprehensible"). The level of intentionality of the misconduct in *Hawkins* was clear and direct, but the level of misconduct here, though pervasive, stemmed from MetLife's failure to control or mitigate the effects of the profit goal it emphasized to its claims employees. Thus, *Hawkins* does not support the Nardel-

lis' argument that they are entitled to a multi-million dollar award of punitive damages, nor is it enough to support even the superior court's 4:1 ratio.

### D. Conclusion Regarding the Amount of Punitive Damages

¶ 99 As we have acknowledged in other cases, "[s]etting the proper amount of punitive damages is challenging." *Hudgins,* 221 Ariz. at 492, ¶ 65, 212 P.3d at 830 (citing *Pope,* 219 Ariz. at 504, ¶ 107, 200 P.3d at 1001).

¶ 100 On the record presented here, the reprehensibility of MetLife's misconduct was low to, at most, moderate. The ratio of the punitive damages to the substantial compensatory damages was large, and the most applicable civil penalties are far less than the punitive damages awarded. Based on our exercise of judgment assessing the three guideposts identified by the United States Supreme Court, we conclude the $55 million in punitive damages awarded by the jury was unconstitutionally excessive. Although the superior court reduced the punitive damages to $620,000 (a 4:1 ratio to the compensatory damages), the record does not justify awarding punitive damages at a ratio above 1:1 ($155,000). Thus, we vacate the judgment of punitive damages entered by the superior court and on remand direct it to enter judgment awarding the Nardellis $155,000 in punitive damages.

### CONCLUSION

¶ 101 For the foregoing reasons, we affirm the superior court's denial of MetLife's motions for judgment as a matter of law on bad-faith liability and the Nardellis' entitlement to punitive damages. We vacate that portion of the superior court's judgment reducing the punitive damages to $620,000 and further reduce the punitive damages to $155,000.

¶ 102 Finally, as discussed in our simultaneously issued memorandum decision, we remand to the superior court to determine the accrual of post-judgment interest and enter an amended judgment consistent with this opinion and our memorandum decision.

CONCURRING: MICHAEL J. BROWN, Presiding Judge.

SWANN, Judge, concurring in part and dissenting in part.

¶ 103 I agree with the majority that the evidence at trial was sufficient to permit the jury to find MetLife liable for bad faith. But because I disagree that there was sufficient evidence to permit a reasonable jury to find by clear and convincing evidence that Met-Life's conduct justified an award of punitive damages under Arizona law, I respectfully dissent in part.

¶ 104 Punitive damages "should be appropriately restricted to only the most egregious of wrongs. 'A standard that allows exemplary awards based upon gross negligence or mere reckless disregard of the circumstances overextends 'the availability of punitive damages, and dulls the potentially keen edge of the doctrine as an effective deterrent of truly reprehensible conduct.' " *Linthicum v. Nationwide Life Ins. Co.,* 150 Ariz. 326, 331, 723 P.2d 675, 680 (1986) (in banc) (quoting *Tuttle v. Raymond,* 494 A.2d 1353, 1361 (Me.1985)). Even viewing the evidence in the light most favorable to the Nardellis, this case simply does not involve "the most egregious of wrongs."

¶ 105 Severe damage to a car is a maddening occurrence. No doubt most owners would prefer a new car even to one that has been well-repaired after heavy damage. But the policy the Nardellis paid for did not require that the vehicle be totaled unless specific criteria were met. There is ample evidence that MetLife handled the investigation of the damage poorly, and that it paid some amount less than it should have for the repairs. MetLife acted in a manner that failed to give equal consideration to the rights of its insureds. It was therefore appropriate for the jury to award compensatory damages for bad faith—even compensatory damages that significantly exceeded the theoretical limits of the policy.[34] But "[t]he type

---

**34.** The fact that an Arizona insurer can be exposed to compensatory damages exceeding poli-

cy limits—and attorney's fees—provides a signifi-

of tortious conduct justifying punitive damages should be only those limited classes of consciously malicious or outrageous acts of misconduct where punishment and deterrence is both paramount and likely to be achieved." *Linthicum*, 150 Ariz. at 331, 723 P.2d at 680. I find no evidence, much less clear and convincing evidence, that MetLife's conduct approached this level of outrage. Indeed, if the conduct in this case is sufficient to warrant punitive damages, I find it difficult to imagine a case in which an insurer could be liable for bad faith without facing a punitive award.

¶ 106 Though it is an intentional tort, commission of bad faith does not itself establish eligibility for punitive damages. In *Rawlings v. Apodaca*, 151 Ariz. 149, 161–62, 726 P.2d 565, 577–78 (1986) (in banc), our supreme court rejected the notion that punitive damages should be available in every bad faith case and (as the majority notes) endorsed the view that "something more" than the conduct necessary to establish the tort must be proven. Not surprisingly, the phrase "something more" has proven to be a difficult legal standard for both judges and juries to apply predictably in practice.

¶ 107 In *Linthicum*, our supreme court forcefully addressed the perils of amorphously defined standards for punitive damages, and warned against their use to justify punitive awards in garden-variety intentional tort cases:

> Having juries decide whether to award compensatory vs. punitive damages based on vague verbal distinctions between mere negligence, gross negligence and reckless indifference is often futile and nothing more than semantic jousting by opposing attorneys. Further, it leads to misapplication of the extraordinary civil remedy of punitive damages....
>
> ...
>
> We, therefore, conclude that a less broad standard for punitive damages is needed. As discussed earlier, it is the "evil mind" that distinguishes action justifying the imposition of punitive damages. In whatever way the requisite mental state is ex-

pressed, the conduct must also be aggravated and outrageous. It is conscious action of a reprehensible character. *The key is the wrongdoer's intent to injure the plaintiff or his deliberate interference with the rights of others, consciously disregarding the unjustifiably substantial risk of significant harm to them.* While the necessary "evil mind" may be inferred, it is still this "evil mind" in addition to outwardly aggravated, outrageous, malicious, or fraudulent conduct which is required for punitive damages. We hold that before a jury may award punitive damages there must be evidence of an "evil mind" and aggravated and outrageous conduct.

150 Ariz. at 331, 723 P.2d at 680 (emphases added) (internal citations omitted).

¶ 108 To illustrate the need for a "less broad" standard, the *Linthicum* court identified 13 separate standards for punitive damages that had appeared in past cases, including the "intent to injure" and "reckless disregard for or indifference to the rights of others" that it later identified as "key." *See id.* at 330–31, 723 P.2d at 679–80. By articulating a two-pronged standard containing both intent and recklessness, however, the *Linthicum* decision can be misread to hold that any tortfeasor who acts at least recklessly may be exposed to punitive damages. I read *Linthicum* to eschew such a broad punitive damage doctrine.

¶ 109 The majority's opinion acknowledges the heightened standard in these oft-cited cases, and finds the "something more" in the fact that MetLife had engaged in an aggressive internal campaign to increase its profits. At bottom, the majority opinion appears to reason that MetLife's focus on profits caused it recklessly to disregard the Nardellis' rights under the policy. But this reasoning conflates the "recklessness" prong of *Linthicum* and the standard for mere tort liability. In *Rawlings,* the court made clear that bad faith is an intentional tort, holding:

> The "intent" required here is an "evil hand"—the intent to do the act. *Mere negligence or inadvertence is not sufficient*—the insurer must intend the act or omission and must form that intent with-

cant deterrent without the need for punitive damages in every case.

out reasonable or fairly debatable grounds.... To be liable for tort damages, it need only to have intended its act or omission, lacking a founded belief that such conduct was permitted by the policy.

The founded belief is absent when the insurer either knows that its position is groundless or when it fails to undertake an investigation adequate to determine whether its position is tenable. In either event, its position is without reasonable basis and subjects it to payment of damages in addition to those traditionally recoverable in a breach of contract action.

151 Ariz. at 160, 726 P.2d at 576 (emphasis added) (footnote omitted).

¶ 110 Here, there was evidence that Met-Life "intended" its acts—it failed to conduct an adequate investigation into the Nardellis' claim and arguably chiseled the claim without a good faith belief that it was acting appropriately under the policy. And its actions were not the result of mere negligence—as the majority forcefully demonstrates, a reasonable inference exists that MetLife's behavior was motivated by concerns for its own profit position.

¶ 111 But a bare profit motive is not "something more," and it is not the "most egregious of wrongs." To the contrary, the quest for profits is among the most ordinary of motivations, and one that our law actually seeks to promote in most commercial contexts.[35] Indeed, it is difficult to imagine *any* case in which an insurer's bad faith is not motivated by its own economic self-interest. By creating the tort of bad faith, our supreme court has made clear that an insurer may not elevate its economic interests above the interests of its insured. But by holding that only the rare and extreme bad faith case qualifies for punitive damages, the court has made clear that a profit motive alone cannot suffice.

¶ 112 This is not a case in which the evidence showed, for example, that MetLife directed its adjusters to determine the proper value of a claim and underpay it, either individually or system-wide. There is no evidence that MetLife set out to defraud its insureds by, for example, misrepresenting the quality of parts used in repairs. There is no evidence that MetLife deprived its insureds of care necessary for life (and even that fact did not result in punitive damages in *Linthicum*). There is no evidence that MetLife set up its system to deny valid claims. And of course there is no evidence that MetLife affirmatively intended to injure the Nardellis.

¶ 113 For these reasons, I would hold that the trial court should have granted MetLife judgment as a matter of law on the issue of entitlement to punitive damages, and I dissent from the portion of the majority's opinion concerning punitive damages. I concur with the remainder of its analysis.

---

**35.** Even torts that would seem inherently to involve an "evil mind," such as fraud, do not automatically qualify for punitive damages. *Rawlings,* 151 Ariz. at 162 n. 8, 726 P.2d at 578 n. 8 ("[P]unitive damages are not recoverable in every fraud case, even though fraud is an intentional tort."). Against that restrictive test, it is anomalous to suggest that ordinary business pressures amount to clear and convincing evidence of an "evil mind."